JOAN BERNARD ARMSTRONG, Chief Judge.
 

 ^STATEMENT OF CASE
 

 On June 20, 2006, the State charged the defendant, Eddie Harrison III, with attempted first degree murder of NOPD Officer Andres Gonzales, a violation of La. R.S. 14:(27)30.
 
 [1]
 
 The defendant pled not guilty at his arraignment on September 5, 2006. On March 8, 2007, the trial court denied the defendant’s Motion to Suppress the Identification. Following a hearing on March 3, 2006, the trial court also denied the defendant’s Motion to Quash the Bill of Information. After a four day jury trial, the defendant was found guilty as charged on March 13, 2008. On March 19, 2008, the defendant filed a Motion for a New Trial, which the trial court denied, and the State filed a multiple bill of information. That same day, the trial court found the defendant to be a second felony offender and sentenced him to one hundred years at hard labor. This appeal follows.
 

 STATEMENT OF FACT
 

 At trial, former NOPD officer Rebecca Gubert testified that on May 22, 2006, she and her partner/victim, NOPD Officer Andres Gonzales, were on patrol in a marked police unit when they stopped a car for suspicion of violation of the ^window tint law. After determining that the vehicle was in fact in violation of the law, Officer Gonzales asked the driver for proof of insurance, registration and driver’s license, none of which the driver could produce. At the same time, Officer Gubert approached the passenger side of the stopped vehicle and encountered the defendant in the front passenger seat. Officer Gonzales ordered the driver to exit the vehicle. As the driver got out of the car, the defendant opened his door and ran. Officer Gubert alerted Officer Gonzales, who pursued the defendant on foot. Officer Gubert secured the driver in the back of the patrol unit, called in a report of the incident and a description of the defendant and followed the chase in the patrol unit. Officer Gubert witnessed Officer Gonzales turn on Verrett Street toward Opelousas Street as he chased the defendant. The next time she saw Officer Gonzales, he was lying on the sidewalk with a neck wound, unable to move. Officer Gubert rendered aid to Officer Gonzales and alerted police dispatch that the victim was wounded. She described the defendant as a muscularly built black male wearing twists in his hair, dark pants and a black t-shirt. Officer Gubert identified the defendant as the fleeing subject in a show up less than two hours after the shooting, and she also made an in-court identification of the defendant. She testified that by the time the defendant had been apprehended he was wearing a white t-shirt.
 

 NOPD Sgt. Arthur Kaufman testified that on May 22, 2006 at approximately 3:15 p.m., he received a report of a shooting in the 500 block of Opelousas Street. Dispatch described the defendant as a black
 
 *451
 
 male, approximately 5'11", six feet tall, twists in his hair, wearing a black shirt and dark jeans. Sgt. Kaufman stated that he was in charge of the investigation of the shooting and was assisted by several NOPD personnel collecting evidence. When Sgt. Kaufman arrived on the |sscene, Officer Gonzales was already en route to the hospital; however Sgt. Kaufman observed a large pool of blood, Officer Gonzales’ gun belt and equipment and several .40 caliber shell casings
 
 [2]
 
 on the ground as well as bullet fragments inside an adjoining Laundromat. At approximately 5:00 p.m., support units brought the defendant back to the scene which is where Officer Gubert and two other witnesses, Ruth Farmer and Erin Farmer, identified the defendant. Additionally, Eddie Guillory also identified the defendant as the man who struggled with Officer Gonzales prior to the shooting. Although the NOPD mounted a massive search for the weapon, it was never recovered. Because of Officer Gonzales’ critical injuries, Sgt. Kaufman was not able to interview him until June 2006, at which time Sgt. Kaufman presented Officer Gonzales with a photographic lineup from which he identified the defendant as the person who shot him. As the investigation progressed, Sgt. Kaufman learned of the existence of a surveillance video taken by the Westside Cleaners; however, Sgt. Kaufman did not view the video and later learned that it had been misplaced.
 

 Madelyn Collins, former NOPD officer and criminalist, testified that she photographed the crime scene and collected four spent .40 caliber bullet casings, a cell phone, one white and one black t-shirt, money, a police radio, a Glock .40 caliber semi-automatic handgun (Sgt. Gonzales’ gun) and a police baton.
 

 ATF Agent Michael H. Hutton assisted the NOPD in its investigation of this case. Agent Hutton supplied one of the agency’s explosives K-9s to search for the gun used to shoot the victim. However, the weapon was never found. Agent Hutton also shipped the gunshot residue kit assembled in this case to the Bexar |4County Texas crime lab for analysis. The test results indicated the presence of gun powder on the defendant’s hands.
 

 Michael Martinez, a forensic scientist supervisor in the trace evidence and firearms section of the Bexar County crime lab, testified that he received and tested the gunshot residue kit sent to him by ATF Agent Hutton. Mr. Martinez’s analysis of the kit revealed the presence of gunshot residue on the defendant’s right and left hand palms.
 

 Mr. Edward Delery, a crime scene technician and former member of the NOPD crime lab, testified that he sketched the crime scene including the 600 blocks of Opelousas and Slidell streets all the way to the levee. The sketches identify the locations of bullet casings, pellet fragments, money and Sgt. Gonzales’ police equipment found on the scene.
 

 Sgt. George Waguespack testified that he assisted in the investigation of the shooting by collecting Officer Gonzales’ clothing and his police equipment from the hospital. Upon examining Officer Gonzales’ bullet proof vest, Sgt. Waguespack discovered a loose spent bullet located in the front panel of the vest. He was present when Officer Gonzales viewed the photo lineup and identified the picture of the defendant as the man who shot him.
 

 
 *452
 
 Former NOPD Detective Gus Bethea testified he assisted in the investigation of the crime by contacting the owners of Westside Cleaners, a dry cleaning business located at Opelousas Street adjacent to the crime scene, on the day of the shooting. Bethea learned that the owners had a video surveillance camera pointed in the direction of the scene of the shooting. Be-thea and Officer Ronald Ruiz along with the owners of Westside Cleaners viewed the black and white videotape which caught the image of two people running past the front window of the |r,business. Because of the poor quality of the tape and because the images on the tape were so fleeting, no identification of the subjects could be made. Bethea had the tape duplicated and placed the original and the copy into the inter-departmental mailbox for delivery to Sgt Kaufman. However, Sgt. Kaufman never received the tape.
 
 [3]
 
 Along with the video tape, Bethea logged into evidence one Louisiana State Driver’s license in the name of Eddie Harrison, one green cigarette lighter, one stocking cap and a black leather wallet retrieved from the scene of the shooting.
 

 Remy Dixon, one of the owners of West-side Cleaners, testified that about 3:00 p.m. on May 22, 2006, he was working at his business and heard gunshots, but did not witness the shooting. Mr. Dixon explained that his business had an inside surveillance camera which is pointed at the front door of the building on Opelousas Street. He viewed the surveillance film which showed two people running past the front of his building just before the gunshots were heard. No identification was possible because the view was so fleeting the figures were blurred. Mr. Dixon said that Officer Gonzales was lying on the ground about fifteen feet from the front door of his business.
 

 Stacey Farmer testified that she lived in the 200 block of Slidell Avenue on May 22, 2006 and heard gunshots in the area. At the same time she heard police sirens in the neighborhood, she looked out her window and saw a man wearing a black shirt with a white t-shirt on his shoulder searching the high grass on Brooklyn Street near her house. She watched the subject until he walked over the river levee and out of sight. Ms. Farmer described the subject as a black male with dreadlocks (in his hair) wearing dark pants with orange writing and two t-shirts — ¡one(i black and one white. She identified the defendant in court as the person she saw looking in the high grass about five minutes after she heard gunshots.
 

 Ruth Farmer and Erin Farmer, Stacey Farmer’s mother and sister respectively, testified. They corroborated Stacey Farmer’s testimony. In a show up shortly after the shooting both Mrs. Ruth Farmer and Erin Farmer identified the defendant as the man they saw looking in the grass near their home. They also made an in court identification of the defendant.
 

 NOPD Sgt. Ronald Ruiz testified that the day after the shooting he helped search for the gun used in the shooting. He and other investigators searched the entire day but no weapon was ever located. Sgt. Ruiz viewed the surveillance tape from the dry cleaning business with Detective Gus Bethea, but was unable to discern any physical characteristics of the two fleeting subjects shown on the tape.
 

 NOPD Officer Carl Thibodeaux testified that he was on the west bank of the river when he heard the report of a shooting in the Algiers area. Officer Thibodeaux proceeded to the intersection of Burmaster and Monroe Streets where he encountered
 
 *453
 
 a man on a train pointing down toward the river. Officer Thibodeaux exited his car and walked to the top of the levee. He saw the defendant walking toward him. When the defendant saw Officer Thibo-deaux, the defendant turned around and proceeded into a grassy area between the river embankment and some barges. At that point, other police units arrived at the scene and pursued the defendant. Officer Thibodeaux made an in court identification of the defendant as the man he saw on the levee.
 

 Detective Eduardo Colmenero assisted in investigating the shooting. The detective collected the defendant’s clothing after his arrest and presented the clothing to Central Evidence and Property. He described the clothing as a white 17tank top, jeans, black socks, multi colored underwear and Nike shoes. Upon examining the clothing, Detective Colmenero observed grass on the pants and possible blood stains on the shoes.
 

 Detective Harold Wischan participated in the investigation by being dispatched to the 700 block of Brooklyn Street in Algiers to recover a white and a black t-shirt.
 

 Sgt. Tyrone Robinson retrieved Officer Gonzales’ duty rig and weapon from the scene in the 600 block of Opelousas Street. Sgt. Robinson gave the evidence to one of the homicide detectives on the scene.
 

 Sgt. Luther Randall assisted in apprehending the defendant. Sgt. Randall heard the report of the shooting from dispatch indicating that the perpetrator was headed toward the levee. When Sgt. Randall arrived at Brooklyn Street, he saw a suspect fitting the description of the shooter walking behind some trains headed to Gretna. When the defendant saw Sgt. Randall and other police units approaching, he surrendered to the officers.
 

 Meredith Acosta, a NOPD firearms expert, examined the .40 caliber handgun, bullets and bullet casings gathered at the crime scene. Ms. Acosta’s testing of the evidence indicated that four of the .40 caliber cartridge cases were fired by the same weapon but not the .40 caliber handgun found at the scene. Comparing one bullet found at the scene with a bullet retrieved from the Elmwood Medical Center proved both bullets were fired by the same weapon, but again, not from the weapon found at the scene.
 

 Jennifer Marie Schroeder worked in the NOPD’s DNA laboratory. After explaining the science and importance of DNA testing for identification purposes, Ms. Schroeder testified that she ran testing on a cheek swab taken from the |8defendant as well as suspected blood spots found on the shoes worn by the defendant at the time of the shooting. The test results came back inconclusive meaning that the samples either were not blood or that the samples had been degraded by the elements and/or fungus or bacteria, rendering the samples useless for forensic purposes.
 

 NOPD Officer Andres Gonzales, the victim, testified that on May 22, 2006, he and his partner, Officer Rebecca Gubert, were on patrol in the Algiers Point area. They affected a vehicular stop of a vehicle suspected of being in violation of the window tint law. Officer Gonzales exited his patrol unit and engaged the driver of the other car. Officer Gonzales explained to the driver the reason for the stop. Officer Gonzales used a meter to test the window tint and found that the tint was in violation of the law. Officer Gonzales asked the driver for identification, registration and proof of insurance, none of which the driver could produce. Officer Gonzales instructed the driver to get out of the vehicle. As the driver complied, the defendant exited the car and fled. Officer Gonzales
 
 *454
 
 chased the defendant down Verrett Street toward Opelousas Street and then toward the river. Officer Gonzales caught up with the defendant on Opelousas Street. The pair began to struggle. The defendant pulled a gun from his clothing and shot Officer Gonzales in the neck, which paralyzed him immediately, and then shot the victim one more time as he lay on the ground. Following several weeks of medical procedures and rehabilitation, Officer Gonzales identified the defendant from a six picture lineup presented to him by Sgt. Kaufman and Det. Waguespack. Officer Gonzales also made an in court identification of the defendant as the man who shot him.
 

 |9Pr. Alan Marr, an expert in critical care and trauma surgery, testified that he attended to Officer Gonzales at Elmwood Trauma Center on the day of the shooting. The doctor noted Officer Gonzales suffered gunshot wounds to the face, neck and arm and was in shock suffering dangerous loss of blood on arrival at the hospital. The gunshot to Officer Gonzales’ neck fractured the hyaloid bone, which helps support the swallowing tube and trachea, tore the top of the trachea and pharynx, proceeded through the fourth and fifth cervical vertebrae and then severed his spinal cord which resulted in instant, non-reversible paralysis. Dr. Marr explained that Officer Gonzales may have very limited use of his hands with rehabilitation, but he will never walk again. The wound to the face caused massive facial fractures. Officer Gonzales underwent eight hours of surgery to repair and stabilize his condition. Neurosurgeons, oral maxillofacial, and ear, nose and throat surgeons assisted in the surgery. During the weeks following the incident, Officer Gonzales underwent two follow up surgical procedures, was placed on a ventilator for two weeks and required antibiotics, pain medication and heavy sedation. Dr. Marr opined that Officer Gonzales will in all likelihood suffer psychological injuries such as post traumatic stress disorder (PTSD). The symptoms of PTSD can include difficulty concentrating and holding a job, exaggerated fear responses, memory loss and probable likelihood of alcohol abuse. At the time Officer Gonzales victim was discharged from Dr. Marr’s care, he was prescribed twelve different medications for treatment of his injuries.
 

 At the victim impact hearing, Officer Gonzales and his parents made statements concerning the life altering impact of his injury. Officer Gonzales stated that his life’s ambition was to be a policeman, an ambition the defendant has taken away from him. He stated that he is unable to perform the everyday tasks 110people take for granted. He requires care twenty-four hours a day, seven days a week. His injuries have stripped him of his dignity, livelihood, dreams, ambitions and hopes for a normal life. The defendant’s action has condemned Officer Gonzales to life in a wheelchair.
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals one. The trial in this matter concluded on March 12, 2008. The trial judge sentenced the defendant on March 19, 2008, following the multiple bill hearing.
 

 La.C.Cr.P. art. 873 provides as follows:
 

 If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
 

 
 *455
 
 In this case, the trial judge imposed sentence immediately after denying the defendant’s Motion for New Trial and Motion for Post Verdict Judgment of Acquittal in violation of the twenty-four hour period mandated in La.C.Cr.P. art. 873. However, after denying the motions, but prior to issuing the sentence, the trial judge asked defense counsel if the defendant had anything to say prior to sentencing. Defense counsel responded negatively indicating that his client was ready for imposition of sentence. Thus, defense counsel waived the delay. Accordingly, this error is harmless.
 

 |,
 
 ^ASSIGNMENT OF ERROR NUMBER
 
 l
 
 [4]
 

 In his first assignment of error, the defendant complains that the trial judge erred in denying his Motion to Quash the Indictment after the State lost potential exculpatory evidence.
 

 The potentially exculpatory evidence to which the defendant refers is the video surveillance tape from Westside Cleaners which was lost prior to trial of this matter. Although the defendant couches this assignment of error in terms of a Motion to Quash for the State’s failure to produce the tape for trial, the issue is more appropriately considered as a
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] violation because the grounds for a Motion to Quash do not include lost evidence. See La.C.Cr.P. arts. 532
 
 [5]
 
 and 534
 
 [6]
 
 .
 

 In
 
 Brady v. Maryland,
 
 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that suppression by the 112prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant’s due process rights where the evidence is material either to guilt or punishment, without re-
 
 *456
 
 gard to the good or bad faith of the prosecution. For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence.
 
 State v. Kemp,
 
 2000-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The
 
 Brady
 
 rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985);
 
 State v. Knapper,
 
 579 So.2d 956, 959 (La.1991).
 

 Nevertheless, it is important to note that
 
 Brady
 
 and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.”
 
 United States v. Agurs,
 
 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of
 
 Brady’s
 
 due process rule, a reviewing court determining materiality must ascertain:
 

 not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.
 

 Kyles v. Whitley,
 
 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also,
 
 State v. Strickland,
 
 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would 113have obtained an acquittal at trial or might do so at a second trial. Instead, a
 
 Brady
 
 violation occurs when the “evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ”
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566 (quoting
 
 Bagley,
 
 473 U.S. at 678, 105 S.Ct. at 3381).
 

 In this case, Sgt. Arthur Kaufman and Detective Gus Bethea each testified at trial that there was no intent to destroy or lose the Westside Cleaners’ videotape. Detective Bethea explained that after duplicating the tape, he placed the tape in Sgt. Kaufman’s mailbox, who stated that he never received the videotape. Both of the officers testified that this activity in the case occurred in the aftermath and confusion of Hurricane Katrina at a time when the NOPD’s resources were destroyed or scattered with several divisions of the police force operating out a small trailer in City Park. The testimony shows that police were operating under trying conditions and limited space. That the videotape was misplaced or lost is not unbelievable and no “bad faith” can be inferred from the situation. Moreover, Detective Bethea, and Sgt. Ronald Ruiz and Remy Dixon, the owner of Westside Cleaners, all testified at trial that the videotape was of no eviden-tiary value. The camera at Westside Cleaners focused on the inside of the business, and only happened to include the door to the business in the background. The figures on the videotape were blurred because the camera was not focused on the area and only one frame of the tape captured the fleeting figures. Hence, the testimony shows that the tape was not favorable to the defendant nor was it material under
 
 Brady.
 

 Finally, evaluating the videotape in the context of the entire case shows that the jury’s verdict was reliable. The facts establish that Officer Gonzales was on duty on May 22, 2006 and that the defendant was a passenger in the car that Officer Gonzales pulled over for a traffic violation.
 
 *457
 
 Officer Gonzales’ partner and | uother witnesses identified the defendant as the person seen fleeing the police and lurking around the crime scene after the shooting. Residue testing done on the defendant’s hand confirmed that the defendant had fired a gun prior to his arrest, and perhaps most important, Officer Gonzales positively identified the defendant as person who shot him. The evidence of the defendant’s guilt is overwhelming. The defendant has failed to show that the videotape in question, had it been available for trial, would have undermined confidence in the outcome of the trial. This assignment is without merit.
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 In his second assignment of error, the defendant alleges that the evidence is insufficient to prove he had the specific intent to kill the victim.
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reviewing court must consider the record as a whole, as would any rational trier of fact. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mussall, supra.
 
 A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.
 
 State v. Smith,
 
 600 So.2d 1319 (La.1992).
 

 | iSThe defendant in this case was charged with the attempted first degree murder of Officer Andres Gonzales.
 

 First degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm upon a fireman or peace officer (including a police officer) engaged in the performance of his lawful duties. La. R.S. 14:30(A)(2, 6). The crime of attempted murder, whether first or second degree, requires proof of the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal.
 
 State v. Huizar,
 
 414 So.2d 741, 746 (La.1982). The specific criminal intent required does not have to be proved as fact, but may be inferred from the circumstances and actions of the defendant.
 
 State v. Boyer,
 
 406 So.2d 143 (La.1981). The discharge of a firearm at close range and aimed at a person is indicative of specific intent to kill or inflict great bodily harm upon that person, as required for a first-degree murder conviction.
 
 State v. Gay,
 
 29,434 (La.App. 2 Cir. 6/18/97), 697 So.2d 642.
 

 The evidence in this case shows that as Officer Gonzales pursued the defendant on foot, the defendant turned on Officer Gonzales and aimed his gun at him. Following a brief struggle over the gun, the defendant shot Officer Gonzales three times, paralyzing him instantly. While Officer Gonzales lay on the ground helpless and unable to move, the defendant shot him one more time. The facts prove that the defendant shot Officer Gonzales while he was performing his duty as a police officer. Further, the evidence is clear that the defendant shot Officer Gonzales with the specific intent to kill the victim. The defendant’s assignment of error as to the sufficiency of the evidence is without merit.
 

 
 *458
 
 ^ASSIGNMENT OF ERROR NUMBER 8
 

 In his third assignment of error, the defendant argues that his sentence of one hundred years without the benefit of probation, parole, or suspension of sentence, after having been convicted of attempted first degree murder and after having been adjudged a second felony offender, is excessive.
 

 Article I, Section 20 of the Louisiana Constitution of 1974 prohibits the imposition of excessive punishment. La. Const. Art. I, 20;
 
 State v. Landry,
 
 2003-1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239-1240. A sentence may violate a defendant’s constitutional right against excessive punishment even if it is within the statutory limit.
 
 Id.; State v. Dorthey,
 
 623 So.2d 1276, 1280 (La.1993). A sentence within the statutory limit is constitutionally excessive if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless imposition of pain and suffering.
 
 State v. Landry,
 
 871 So.2d at 1239-1240, citing
 
 State v. Johnson,
 
 97-1906 (La.3/4/98), 709 So.2d 672, 676
 

 Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case.
 
 State v. Black,
 
 98-0457, p. 8 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 892. If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case.
 
 State v. Caston,
 
 477 So.2d at 871. The reviewing court must also keep in mind that maximum sentences should be reserved for the most egregious violators of the offense charged.
 
 State v. Quebedeaux,
 
 424 So.2d 1009, 1014 (La.1982).
 

 | ,7The trial court has great discretion in sentencing within the statutory limits.
 
 State v. Trahan,
 
 425 So.2d 1222 (La.1983). The reviewing court shall not set aside a sentence for excessiveness if the record sujiports the sentence imposed. La.C.Cr.P. art. 881.4(D).
 

 La. R.S. 14:30(0(2) provides that anyone convicted of first degree murder in Louisiana when a capital verdict is not sought, shall be punished by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.
 

 La. R.S. 14:27(D)(l)(a) states that anyone convicted of the attempted commission of an offense that would otherwise be punishable by death or life imprisonment shall be imprisoned at hard labor for not less than ten nor more than fifty year without the benefit of parole, probation or suspension of sentence.
 

 La. R.S. 15:529.1(A)(l)(a) mandates that if an individual is convicted of a felony and is adjudicated a second felony offender, the offender will be sentenced to imprisonment for not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.
 

 In this case, the defendant was convicted of attempted first degree murder. A conviction of first degree murder mandates a minimum sentence of life, but for an attempt to commit first degree murder, the defendant faced a sentencing range of ten to fifty years. However, because the defendant was adjudicated a second felony offender,
 
 [7]
 
 his sentencing range was twenty-five to one hundred years, or one-half to twice the maximum for attempted first
 
 *459
 
 degree murder. Consequently, the defendant’s one hundred year sentence falls ■within Louisiana’s sentencing guidelines.
 

 |18In tailoring the defendant’s sentence in this case, the trial court noted that the defendant has a prior conviction for a crime of violence (armed robbery), that the defendant failed to use his time in prison to better himself, that after being released from prison he committed this crime, another crime of violence, and also violated the law by possessing a firearm. In fact, the trial court noted that after he was released from prison, he was also arrested in 2003 for auto theft, felon in possession of a firearm and aggravated assault with a firearm upon a police officer, thus evidencing his propensity for violence and need of custodial environment.
 

 The trial court also re-emphasized that because of the defendant’s criminal behavior, Officer Gonzales will never walk again, never enjoy the quality of life he previously had, will be dependent on his family for remainder of his life, which in all likelihood, will be shortened because of his injury. Finally, the judge condemned the defendant’s cruelty in shooting Officer Gonzales and leaving him completely helpless to bleed death on the sidewalk.
 

 It is evident from the foregoing that the trial court followed the guidelines set forth in La.C.Cr.P. art. 894.1(C) by articulating for the record the basis for the defendant’s sentence. The reasons set forth in support of the maximum sentence available in this case include at least seven of the sentencing considerations of La.C.Cr.P. art. 894.1(B).
 

 This circuit and at least one other have upheld one hundred years sentences for lesser crimes. See
 
 State v. Hills,
 
 1998-0507 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215 (one hundred years for second offender for attempted second degree murder);
 
 State v. Douglas,
 
 39,036 (La.App. 2 Cir. 10/29/04), 888 So.2d 982 (one |iahundred years for attempted second degree murder). This assignment of error is without merit.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the defendant’s conviction and sentence.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . The defendant was also charged with one court of being a felon in possession of a firearm. However, that count was severed and eventually dismissed.
 

 [2]
 

 . None of the casings matched the victim's service weapon. Testing showed that the victim had not fired his weapon.
 

 [3]
 

 . Testimony indicates that the tape was lost.
 

 [4]
 

 . This court issued an order on March 9, 2009 that granted the defendant’s request to file a pro se supplemental brief and gave the defendant forty-five days from the issuance of the order to file the supplemental brief. Our review of the record shows that the defendant did not file the supplemental brief.
 

 [5]
 

 . C.Cr.P. art. 532 provides:
 

 General grounds for motion to quash
 

 A motion to quash may be based on one or more of the following grounds:
 

 (1) The indictment fails to charge an offense which is punishable under a valid statute.
 

 (2) The indictment fails to conform to the requirements of Chapters 1 and 2 of Title XIII. In such case the court may permit the district attorney to amend the indictment to correct the defect.
 

 (3) The indictment is duplicitous or contains a misjoinder of defendants or offenses. In such case the court may permit the district attorney to sever the indictment into separate counts or separate indictments.
 

 (4) The district attorney failed to furnish a sufficient bill of particulars when ordered to do so by the court. In such case the court may overrule the motion if a sufficient bill of particulars is furnished within the delay fixed by the court.
 

 (5) A bill of particulars has shown a ground for quashing the indictment under Article 485.
 

 (6) Trial for the offense charged would constitute double jeopardy.
 

 (7) The time limitation for the institution of prosecution or for the commencement of trial has expired.
 

 (8) The court has no jurisdiction of the offense charged.
 

 (9) The general venire or the petit jury venire was improperly drawn, selected, or constituted.
 

 [6]
 

 . C.Cr.P. art. 534 provides:
 

 Special grounds for motion to quash information
 

 A motion to quash an information may also be based on one or more of the following grounds:
 

 (1) The information was not signed by the district attorney; or was not properly filed.
 

 (2) The offense is not one for which prosecution can be instituted by an information.
 

 [7]
 

 . The defendant pled guilty to armed robbery in Jefferson Parish in 1999.