ROLAND L. BELSOME, Judge.
 

 | Defendant-Appellant was found guilty as a principal of attempted second-degree murder. Considering the record in its entirety, we find that the evidence was insufficient to support the conviction under these particular facts and circumstances, and vacate Appellant’s conviction and sentence.
 

 STATEMENT OF THE CASE
 

 Defendant-Appellant Ulysses M. Cooks was charged by bill of information on June 4, 2009, with being a principal to attempted second degree murder, a violation of La. R.S. 14:24, 14:27 and 14:80.1. Defendant was jointly indicted with Joshua Lyons, who was charged with attempted second degree murder of the same victim. Defendant pleaded not guilty at his June 15, 2009 arraignment. On August 20,
 
 *934
 
 2009, the trial court granted defendant’s motion to subpoena the victim to testify at defendant’s preliminary examination. The State sought supervisory review in this court. On September 30, 2009, this court stayed all proceedings; on October 2, 2009, this court denied the writ and lifted the stay.
 
 [1]
 
 On October 20, 2009, the Louisiana Supreme Court granted the writ and reversed the decisions by the trial court and this Court.
 
 [2]
 
 On February 9, 2010, the trial court heard and denied 1 ^defendant’s motions to suppress the statement and identification. Defendant was tried by a twelve-person jury, along with his codefendant, Joshua Lyons, on April 27-28, 2010, and both were found guilty as charged. On September 24, 2010, the trial court found defendant not to be a habitual offender. On October 15, 2010, the trial court found defendant to be a fourth-felony habitual offender and sentenced him as such to the minimum sentence of fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. On that date the trial court granted defendant’s previously-filed motion for appeal.
 

 FACTS
 

 Defendant and his codefendant Joshua Lyons were jointly charged, tried, and convicted in the March 10, 2009 shooting of Donnie Floyd.
 

 New Orleans Police Department Detective Wayne M. DeLarge III testified that he investigated an aggravated battery at approximately 1:28 a.m. on March 10, 2009, at 3719 Washington Avenue, Apartment 42. The victim, Donnie Floyd, was leaning on a parked car talking on a telephone, struggling to maintain his balance, and verbally expressing his anger. Det. De-Large said he did not consider the victim as a cooperative witness. The victim also expressed to the detective that he wanted to deal with the matter on his own, meaning he wanted to retaliate; however, Det. DeLarge testified that the victim later changed his mind when he could not feel his legs and toes as a result of the shooting. Det. DeLarge further testified that he reviewed a report written by Officer Helen Earls,
 
 [3]
 
 one of the officers on the scene, and learned that the victim initially stated that he did not know the individual who shot him.
 

 | ¡¡Floyd ultimately told Det. DeLarge that he loaned an African-American male he knew as “Michael,” a family friend, two hundred dollars, and that when he asked “Michael” for the money, a verbal altercation ensued, at which time he was shot in the back by another individual. Floyd told the detective that he knew the individual who shot him in the back as “Slim.” Det. DeLarge developed defendant as the “Michael” suspect. He showed Floyd a photo lineup while he was in the hospital, and he selected defendant’s photo. Det. DeLarge developed codefendant Lyons as the “Slim” suspect. The detective applied for arrest warrants for both men on March 13, 2009.
 

 Also on March 13, 2009, an individual who identified himself as defendant telephoned Det. DeLarge. The caller initially told the detective that he was in Apartment 42 by himself, but subsequently stated that he had been in the apartment with Donnie Floyd. Defendant did not mention the shooting, but indicated that he ran from the scene due to fear of police. Asked during cross-examination whether
 
 *935
 
 he made any attempt to verify that person he had talked to was defendant, Det. De-Large replied that he had previously spoken to defendant’s sister, who told the detective that defendant would be calling.
 
 [4]
 

 Det. DeLarge testified that he spoke to codefendant Joshua Lyons on March 16, 2009, after Lyons had already turned himself in. Lyons initially told the detective that he was at the apartment and saw Floyd with a gun, and then saw defendant fleeing the scene with a gun; Lyons then told the detective that he was not at the apartment, but had been across the street. Lyons also told Det. DeLarge that he had run out the back window.
 
 [5]
 

 |4On cross-examination, Det. DeLarge testified that at the time Donnie Floyd was being taken to the hospital, Floyd told him that “Michael” (the defendant) was involved in the incident, but not that “Michael” had shot him. When Det. DeLarge spoke to Floyd the day after the shooting, on March 11, 2009, Floyd told him that defendant had set him up. Det. DeLarge replied in the negative when asked whether Floyd told him that defendant made any hand gestures or whether Floyd told him that he saw any signs from defendant to indicate to Joshua Lyons to shoot Floyd. Floyd reported to Det. DeLarge that defendant was standing in front of him when he was shot in the back by Lyons, but did not indicate whether anyone else had been inside the apartment at the time of the incident.
 
 [6]
 

 Det. DeLarge confirmed that Floyd told Officer Earls that he was involved in a verbal altercation with an unidentified male that escalated to a physical confrontation, and that he turned his back in an attempt to walk away from that male, at which time he was shot. The detective confirmed that as far as he knew, Floyd never mentioned to Officer Earls that there were two people, or that one of them set him up, or that he knew either one.
 
 [7]
 

 Donnie Floyd, the victim, testified that he was living at 3719 Washington Avenue, Apartment 24, on March 10, 2009. Another residence in the same complex, Apartment 42, was occupied by an individual named John Henry. At approximately 1:30 a.m. that morning, when Floyd was downstairs, coming into | Bthe yard, he observed “Michael” in John’s doorway, an individual who Floyd subsequently identified as defendant, Ulysses Cooks.
 
 [8]
 

 Floyd testified that defendant owed him one thousand dollars
 
 [9]
 
 for drugs he had previously purchased from him.
 
 [10]
 
 When
 
 *936
 
 Floyd saw defendant, he called to him, but defendant went into John’s apartment instead. Floyd followed defendant to John’s apartment, which was an upstairs unit. After Floyd asked to speak to defendant, John invited him inside the apartment. Floyd testified that in the course of the conversation with defendant in the living room, defendant advised Floyd that he was not going to pay him at all. Upon learning this information, Floyd became angry and his voice rose, at which time John asked Floyd and defendant to take the argument outside.
 

 At some point during the argument, Floyd and defendant were pushing each other, and Floyd pushed defendant onto the sofa. Floyd testified that he began backing towards the door, and then stood in the doorway, facing inside the apartment, continuing to argue with defendant. Floyd stated that as he was continuing to argue with defendant, he looked back to see who was behind him “because ain’t nobody was out there kin to me or anything. Everybody was [defendant’s] friend, and, you know, so on.” Floyd confirmed that he saw the person he knew as “Slim,” codefendant Joshua Lyons, at the apartment, and that Lyons had been in the back bedroom of the apartment with his girlfriend. Floyd testified that when he looked back, he observed Lyons exit the apartment behind him.
 

 | (¡Floyd testified that he and defendant continued “arguing in the door.” Floyd further testified that as the ongoing argument escalated, “all I can remember is [defendant] was signaling to the person that he was scared because I did have a gun on me at the time.” When questioned about this statement, Floyd confirmed that he had pulled out a Glock .40 caliber semiautomatic handgun, but insisted that he was not pointing it at anyone and that the gun was not loaded. Floyd conceded that he did not advise anyone that the gun was not loaded, and that no one would have known that the gun was not loaded. Floyd further testified that he did not observe any of the surrounding individuals to be armed.
 

 At this point, Floyd testified that when he looked back, he noticed that Lyons was standing downstairs, on the first floor, while he and defendant remained at the top of the stairs arguing. Floyd recalled that the stairs went straight down from the second floor and estimated there were about twenty-four stairs in the stairway. Floyd testified that defendant then signaled Lyons to shoot Floyd, which caused him look back downstairs, at which time he saw Lyons and a spark. Floyd confirmed that he was looking at defendant when he was shot.
 

 When asked how defendant signaled Lyons, Floyd testified that defendant used his eyes to signal “like, like, handle your business like. Like telling, you know, like if I’m telling somebody like, you know, ‘Handle your business. Handle your business.’ ” Upon being questioned as to what defendant did
 
 specifically
 
 to signal Lyons, Floyd denied that defendant said “Handle your business,” testifying that defendant “signaled like with his eyes and his hands, you know, like to shoot me.” Floyd confirmed that defendant did not say “shoot me [Floyd],” “because if [ 7he would have said shoot me I would have known somebody was about to shoot me.”
 

 Floyd testified that after he was shot, he fell to his knees, at which time defendant grabbed Floyd’s gun and ran. Floyd admitted that he lied when he told police he did not know who shot him because initial
 
 *937
 
 ly, he was angry and wanted to “reveng[e] who shot me on my own.” Floyd further testified that he changed his mind about seeking revenge while he was hospitalized and decided that it would not be worth it to kill anyone over selling drugs.
 
 [11]
 

 When asked on cross-examination whether he had informed Det. DeLarge that he brought a weapon to the apartment, Floyd replied “[n]ot that I know of.” Upon being questioned further, Floyd testified that Det. DeLarge never asked him if he had a weapon.
 
 [12]
 
 When Floyd was asked whether he had the handgun on his person the entire day, he replied that it was in his car and he retrieved it prior to going to John’s apartment to confront defendant about the debt. Floyd again admitted that defendant did not have a gun.
 

 Floyd denied that he was arguing with Lyons the day he was shot and stated that Lyons did not owe him any money. However, Floyd testified that earlier that same week, Lyons had walked up to his mother and father with a gun and advised them that if Floyd did not stop selling drugs, he was going to shoot and kill Floyd. After learning of the confrontation, Floyd drove his mother and father around, and his mother pointed out Lyons to him. Floyd admitted that he should have notified | spolice about the Lyons threat then, but did not. Floyd speculated that on the day he was shot, Lyons saw an opportunity to take him out.
 

 Det. DeLarge, recalled as a witness by defendant, confirmed that the first time he spoke with Donnie Floyd was on the night of the shooting when Floyd was in an ambulance at the scene, and that Floyd told him that the incident was over a two-hundred dollar debt. The detective further testified that he also spoke to Floyd the day after the shooting, while Floyd was in the hospital, and at that time, Floyd reiterated that the incident was over a debt of two hundred dollars. Det. De-Large testified that Floyd did not mention that the debt was one thousand dollars, or that the debt was for the purchase of drugs. Additionally, Det. DeLarge confirmed that in his conversation with Floyd, Floyd never indicated that defendant made any kind of hand motions or any type of motions at all to signal Lyons to shoot Floyd.
 

 ERRORS PATENT
 

 A review of the record reveals no errors patent.
 

 ASSIGNMENT OF ERROR NO. 2
 

 Defendant’s second assignment of error is that the evidence was insufficient to support the conviction in several respects: (1) as to defendant being a principal to the crime of attempted second degree murder; (2) as to defendant having a specific intent to kill the victim; and (3) as to the shooting not being justifiable as in self-defense.
 

 When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992);
 
 State v. Marcantel,
 
 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55. This court set forth the well-settled applicable standard of review for sufficiency of the evidence in
 
 State v.
 
 
 *938
 

 Huckabay,
 
 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Green,
 
 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mus-sall; Green; supra.
 
 “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.”
 
 State v. Smith,
 
 600 So.2d 1319 (La.1992) at 1324.
 

 Huckabay,
 
 2000-1082, p. 32, 809 So.2d at 1111 (quoting
 
 State v. Ragas,
 
 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107). With regard to circumstantial evidence, this court has recognized that all evidence must meet the reasonable doubt standard:
 

 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 State v. Shapiro,
 
 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from
 
 Jackson v. Virginia, supra,
 
 but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.
 
 State v. Wright,
 
 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the
 
 Jackson
 
 reasonable doubt standard.
 
 State v. Jacobs,
 
 504 So.2d 817 (La.1987).
 

 Id.
 

 | min this case, defendant was convicted of being a principal to attempted second degree murder. Second degree murder is defined, in pertinent part, as “the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1(A)(1). A person is guilty of an intent to commit an offense if, having a specific intent to commit crime, he does an act for the purpose of and tending directly toward the accomplishing of his object, and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A). The parties to crimes are classified as either principals or as accessories after the fact. La. R.S. 14:23. “All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” La. R.S. 14:24.
 

 To obtain a conviction for attempted second degree murder the State
 
 *939
 
 must prove the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death.
 
 State v. Bishop,
 
 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437;
 
 State ex rel. G.B.,
 
 2007-1577, p. 4 (La.App. 4 Cir. 5/14/08), 985 So.2d 828, 830. Attempted second degree murder requires proof of specific intent to kill.
 
 Bishop, supra; State v. Johnson,
 
 2008-1488, p. 10 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 334,
 
 writ denied,
 
 2010-0624 (La.10/8/10), 46 So.3d 1267. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
 
 Bishop, supra; State v. Summers,
 
 2010-0341, p. 7 (La.App. 4 Cir. 12/1/10), 52 So.3d 951, 956. Specific intent can be formed in an instant.
 
 State v. Cousan,
 
 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390;
 
 State v. Sartain,
 
 2008-0266, p. 27 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132, 1148.
 

 Self Defense/Justification
 

 Defendant argues that codefendant Lyons shot Donnie Floyd in defense of defendant. La. R.S. 14:19(A) states:
 

 A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.
 

 La. R.S. 14:22 states:
 

 It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
 

 In a non-homicide situation, the defense of justification requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; and (2) a subjective inquiry into whether the force was apparently necessary.
 
 State v. Fluker,
 
 618 So.2d 459, 462 (La.App. 4 Cir.1993).
 

 It is unsettled, at least in this circuit, whether the burden of proof as to a claim of self-defense in a non-homicide situation is: (1) upon the defendant to establish by a preponderance of the evidence that he acted in self-defense; or (2) upon the State to establish beyond a reasonable doubt that the defendant did not act in self-defense. However, it is well-settled that the latter standard is applicable in a homicide situation.
 
 See Fluker,
 
 618 So.2d at 463. In
 
 Fluker,
 
 this Court held that the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense:
 

 |12We see no distinction between these provisions [La. R.S. 14:18, 14:19, and 14:20], and fail to see why the State would have the burden of disproving in one situation (homicide), and why the defendant would bear the burden of proving in another (nonhomicide). Absent a clear direction from our legislature, we feel that the defendant should not have the burden of proving anything.
 

 Fluker,
 
 618 So.2d at 463;
 
 see also State v. Wischer,
 
 2004-0325, pp. 8-9 (La.App. 4 Cir. 9/22/04), 885 So.2d 602, 606-607 (holding that in a nonhomicide situation the defendant has the burden of showing justification, as an affirmative defense, by a preponderance of the evidence).
 

 In several instances, this court acknowledged
 
 Fluker
 
 and
 
 Wischer,
 
 but ultimately
 
 *940
 
 found it unnecessary in each case to resolve the conflicting decisions because, under the particular facts of each case the evidence was sufficient to negate the defendant’s claim of self-defense applying either standard.
 
 See State v. Black,
 
 2009-1664 (La.App. 4 Cir. 6/17/10), 41 So.3d 1243,
 
 writ denied,
 
 2010-1678 (La.1/28/11), 56 So.3d 966;
 
 State v. Boudreaux,
 
 2008-1504 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1162,
 
 writ denied,
 
 2010-2434 (La.4/8/11), 61 So.2d 682;
 
 State v. Stukes,
 
 2008-1217 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233; and
 
 State v. Jefferson,
 
 2004-1960 (La.App. 4 Cir. 12/21/05), 922 So.2d 577. The inquiry as to defendant’s self-defense claim is whether the shooting of Donnie Floyd one time was objectively reasonable and, subjectively, whether it was apparently necessary to prevent a forcible offense against defendant.
 
 See
 
 La. R.S. 14:19(A);
 
 Fluker,
 
 618 So.2d at 462.
 

 In this case, Donnie Floyd was the sole aggressor; he was also an admitted drug dealer who armed himself in preparation to collect a drug debt from defendant. Floyd argued with defendant, repeatedly demanding the money he claimed defendant owed him, raising his voice to such a degree that the tenant [1sasked them to take the altercation outside. Floyd also conceded that he pushed defendant onto a sofa, thus committing a simple battery upon defendant.
 
 [13]
 
 Floyd backed up into the doorway leading outside and pulled out the handgun, inferring that he did so because he was afraid for his safety because others in the apartment were taking defendant’s side in the argument over the drug debt. However, Floyd articulated no threat from others, only mentioning that those inside the apartment were defendant’s family members and friends and that they were taking defendant’s side of the argument.
 

 When Floyd backed toward the door, still arguing with defendant, who was facing him, Floyd admittedly drew a semiautomatic handgun. Floyd insisted that the gun was not loaded, but conceded that no one else would have been able to tell that the gun was unloaded; thus, to anyone present, Donnie Floyd had drawn and was holding a loaded gun. Furthermore, Floyd testified that the individuals in the apartment knew that he carried a gun. . Notably, Floyd confirmed that to his knowledge, no one else was armed, and specifically, that defendant was not armed. Floyd also replied in the negative when asked whether he ever saw a gun on code-fendant Lyons.
 

 Although Floyd testified that earlier the same week Lyons had walked up to his mother and father with a gun and told them that if Floyd did not stop selling drugs he was going to shoot and kill him, and speculated that on the day he was shot Lyons saw an opportunity to take him out, there was no independent evidence substantiating this threat claim, nor any evidence suggesting that defendant was aware of such a threat having been made by Lyons. Furthermore, as previously 114noted herein, Floyd admitted that he was the only one who knew his gun was unloaded and that others knew he carried a gun.
 

 Considering the foregoing, we find that Floyd, having drawn a semiautomatic weapon, was perpetrating a forcible offense against defendant’s person, an aggravated assault, and thereby intentionally placed defendant in reasonable apprehension of receiving a battery committed with a dangerous weapon.
 

 
 *941
 
 “An assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.” La. R.S. 14:36. “An aggravated assault is an assault committed with a dangerous weapon.” La. R.S. 14:37(A). An unloaded firearm can be considered a “dangerous weapon.”
 
 See State v. McClinton,
 
 329 So.2d 676, 676, n. 1 (La.l976)(“[A] person may be convicted of robbery with a dangerous weapon even though the gun used is unloaded and/or unworkable.
 
 State v. Elam,
 
 312 So.2d 318 (La.1975);
 
 State v. Levi,
 
 259 La. 591, 250 So.2d 751 (1971)”). An aggravated battery is a battery committed with a dangerous weapon. La. R.S. 14:34. Aggravated assault and aggravated battery are defined as crimes of violence.
 
 See
 
 La. R.S. 14:2(B)(7); (5).
 

 In this case, Floyd was in the doorway or slightly outside it, essentially blocking defendant’s exit from the apartment, holding a .40 caliber Glock semiautomatic pistol in his hand. Floyd, the aggressor, had drawn the gun while engaged in a heated argument with defendant and after committing a simple battery upon defendant. Floyd had escalated the confrontation from an argument or verbal altercation, to a simple battery, to an aggravated assault. Furthermore, it was Floyd’s admitted opinion that defendant signaled Lyons because defendant was afraid for his safety after Floyd drew the gun and held it in his hand.
 

 1 ^^Accordingly, defendant argues that Lyons could have reasonably believed that shooting Floyd was necessary to prevent Floyd from perpetrating a forcible offense upon defendant, thus justifying the shooting under La. R.S. 14:22; likewise, the action by defendant, if any, was justified pursuant to La. R.S. 14:19(A). Because we find that the evidence was insufficient to establish that defendant had the specific intent to kill Donnie Floyd, it is unnecessary to determine whether the action by defendant, if any, was justified.
 

 Principal-Specific Intent to Kill
 

 Defendant further argues that the evidence was insufficient to establish that he was a principal, given that there was insufficient proof that defendant planned, signaled, directed, or otherwise intended for anyone outside to shoot Donnie Floyd. Defendant also argues that the evidence was insufficient to establish that he had the requisite specific intent to kill Floyd.
 

 To prevail on its charge that defendant was guilty as principal to the attempted second degree murder of Donnie Floyd, the State had the burden of proving beyond a reasonable doubt that defendant harbored specific intent to kill Donnie Floyd, and not merely that defendant knew of Joshua Lyons’ specific intent to kill Floyd.
 
 State v. Bridgewater,
 
 2000-1529, p. 10 (La.1/15/02), 823 So.2d 877, 890. “The shooter’s specific intent [to kill]
 
 cannot
 
 be transferred to the principal; ‘[a]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state.’ ”
 
 Bridgewater,
 
 2000-1529, pp. 10-11, 823 So.2d at 890, quoting
 
 State v. Pierre,
 
 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428 (emphasis added). Therefore, to demonstrate that the non-shooter had the specific intent to kill, the State was required to establish that the circumstances indicated that the non-shooter, the defendant in this case, also Inactively desired the death of the victim.
 
 See State v. Holmes,
 
 388 So.2d 722, 726-27 (La.1980).
 

 Accordingly, proof beyond a reasonable doubt that the defendant had specific intent to kill is necessary to sustain a conviction for attempted second degree murder, the offense for which defendant in the instant case was convicted.
 
 Bishop,
 
 
 *942
 

 supra; Johnson, supra.
 
 Both the Louisiana Supreme Court and this Court have held that specific intent to kill can be inferred by pointing and firing a gun at a person.
 
 Bridgewater, on rehearing,
 
 2000-1529, p. 3, 823 So.2d at 910;
 
 State v. Seals,
 
 95-0305, p. 6 (La.11/25/96), 684 So.2d 368, 373;
 
 State v. Scott,
 
 2009-0138, p. 8 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, 289,
 
 writ denied,
 
 2009-2773 (La.6/18/10), 38 So.3d 320;
 
 State v. Collor,
 
 99-0175, p. 10 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 102. The foregoing cases involved convictions for first or second degree murder, where proof of a specific intent “to kill or to inflict great bodily harm” was sufficient to support the respective convictions, not in cases involving attempted first or second degree murder, as in the instant case, where proof of specific intent to kill is required. Moreover, any authority cited in the above-referenced cases for the proposition that specific intent to kill may be inferred from pointing a gun and firing it also was based upon decisions where specific intent “to kill or to inflict great bodily harm” was at issue.
 

 Contrast the broad statement in the cases cited above, that specific intent to kill may be inferred from a defendant’s pointing and firing a gun at a person, with the narrower statement in a more recent decision by the Louisiana Supreme Court,
 
 State v. Lewis,
 
 2009-1404 (La.10/22/10), 48 So.3d 1073, that it is “settled jurisprudence that specific intent to kill may be inferred from the act of pointing a gun and firing at a person
 
 in close proximity.” Lewis,
 
 2009-1404, p. 5, 48 So.3d at 1076 (emphasis added) (citing
 
 State v. Tassin,
 
 536 So.2d 402, 411 (La.1988) (“pointing and firing a gun at point-blank range supports an inference of specific intent to kill”);
 
 State v. Noble,
 
 425 So.2d 734, 736 (La.1983) (“same”));
 
 see also State v. Hoffman,
 
 98-3118, p. 48 (La.4/11/00), 768 So.2d 542, 585.
 

 In
 
 Hoffman,
 
 the defendant appealed a conviction for first degree murder. While the court set forth the broader rule that specific intent to kill can be inferred from pointing and firing a gun at a person, it also acknowledged that “most cases which have found evidence sufficient to support an inference of specific intent have relied on the
 
 proximity
 
 of the gunman to the victim: close-range or pointblank.”
 
 Id.
 
 (emphasis added) (citing
 
 State v. Lindsey,
 
 543 So.2d 886, 902-03 (La.1989));
 
 State v. Maxey,
 
 527 So.2d 551, 555 (La.App. 3d Cir.1988),
 
 writ denied,
 
 541 So.2d 868 (La.1989) (“specific intent inferred when defendant put gun to head of victim and fired”);
 
 State v. Latchie,
 
 535 So.2d 541, 542 (La.App. 3d Cir.1988) (“specific intent inferred when defendant shot victim once through windshield, striking the victim in head, and then moved to side of car and shot four more times into the car”).
 

 Accordingly, the foregoing jurisprudence suggests that, while pointing and firing at gun at a person is a circumstance from which an inference can be drawn that a defendant possessed specific intent to kill, the circumstances surrounding that act, such as the distance from the firearm to the victim and the number of shots fired, must also be considered.
 
 See State v. Taylor,
 
 533 So.2d 94, 98 (La.App. 4 Cir.1988) (evidence sufficient to sustain conviction for attempted second degree murder where defendant shot the victim once at close range, then chased him, firing two more shots which missed, and firing a fourth shot which hit the victim in the back);
 
 State v. Simmons,
 
 454 So.2d 408, 409 (La.App. 4 Cir.1984) (evidence 118sufficient to sustain conviction for attempted second degree murder where defendant shot victim three times with a .38 caliber revolver).
 

 
 *943
 
 In the instant case, viewing all the evidence in a light most favorable to the prosecution, it cannot be said that the jury’s apparent factual conclusion that defendant made some type of gesture to, or “signaled” to, Lyons or some other person behind Donnie Floyd, was clearly contrary to the evidence.
 

 Floyd testified that defendant signaled to Lyons or the person behind him because defendant was scared because Floyd was holding a handgun. Floyd said defendant used his eyes to signal “like, like, handle your business like. Like telling, you know, like if I’m telling somebody like, you know, “Handle your business. Handle your business.” When asked what defendant did specifically, Floyd said defendant “signaled like with his eyes and his hands, you know, like to shoot me.” Floyd confirmed, however, that defendant did not say “shoot me,” “because if he would have said shoot me I would have known somebody was about to shoot me.” Floyd never clarified what the nature or the character of the alleged “signals” by defendant were such that any rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have inferred that any type of “signal” or gesture made by defendant with his hands or his eyes was a signal to Joshua Lyons, who was at the bottom of a flight of stairs, to shoot Floyd, much less to kill Floyd.
 

 Likewise, defendant questions how he could have signaled the shooter if the shooter was downstairs, defendant was inside the apartment, and Donnie Floyd was in between them, blocking the shooter’s view of defendant. Floyd estimated that Lyons was twenty-four stairs down at the time of the shooting, while he and defendant were on the second floor, and he was somewhere between the door and l^the porch. While it is unclear precisely how far away defendant was, Floyd testified that he was facing defendant at the time of the shooting. Other than Floyd’s testimony that defendant signaled Lyons, the record is lacking evidence that defendant could have actually done so. The State introduced no photos of the crime scene or any other evidence from which the jury could have ascertained the shooter’s view of defendant immediately before the shooting.
 

 The fact that Lyons (or another person behind Floyd) shot Floyd is insufficient to color the vague description of an alleged “signal” by defendant as a signal to shoot Floyd, much less as a signal to shoot and kill Floyd. A court reviewing the evidence for sufficiency “must assure that the jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt.”
 
 State v. Mitchell,
 
 99-3342, p. 8 (La.10/17/00), 772 So.2d 78, 83, citing
 
 State v. Mussall,
 
 523 So.2d 1305, 1311 (La.1988). In this case, viewing the evidence in a light most favorable to the prosecution, any conclusion that defendant signaled to someone to kill Floyd would be purely speculative.
 

 With regard to specific intent to kill being inferred from the circumstances of the shooting, it can be noted that the shooter shot Floyd only once, although it is not known what type of firearm the shooter had or if it was capable of firing more than one shot by successive pulls of the trigger.
 
 [14]
 
 Donnie Floyd’s own testimony is that Joshua Lyons was at a distance from Floyd of twenty-four stairs, from the first to the second floor, at the time he
 
 *944
 
 shot Floyd. It can be noted that, although Floyd admitted that no one present at that time would have known his gun was not loaded, when defendant grabbed the gun after Floyd was shot and fell to his knees, | ^defendant made no attempt to shoot Floyd with the gun. Rather, defendant fled the scene, which, under the circumstances, was consistent with defendant seeking to protect himself from further harm.
 

 Viewing all the evidence in a light most favorable to the prosecution, no rational trier of fact could have inferred that this vague signal or gesture by defendant to Lyons or another person was a signal for that person to shoot Floyd, such that it could be inferred that defendant had the specific intent to kill Donnie Floyd. It necessarily follows that no rational trier of fact could have found defendant a principal to the attempted second degree murder of Donnie Floyd, or that defendant, having the specific intent to kill Floyd, aided and abetted, or counseled or procured the shooter to shoot Donnie Floyd.
 

 ASSIGNMENT OF ERROR NO. 1
 

 In his first assignment of error, defendant claims that the trial court erred in denying defendant’s motion for a mistrial after the State elicited other crimes evidence from Donnie Floyd. Defendant also argues prosecutorial misconduct, alleging that the State presented Floyd as a credible witness, despite knowing of several changes in Floyd’s story before and during the trial. We pretermit discussion of this assignment of error in light of our determination to reverse defendant’s conviction.
 

 ASSIGNMENT OF ERROR NO. 3
 

 Defendant also argues that his sentence is unconstitutionally excessive. This assignment of error is moot.
 

 121DECREE
 

 For the foregoing reasons, defendant’s conviction is reversed and his sentence is hereby vacated.
 

 CONVICTION REVERSED; SENTENCE VACATED
 

 [1]
 

 .
 
 State v. Lyons,
 
 2009-1306, unpub. (La.App. 4 Cir. 10/2/09).
 

 [2]
 

 .
 
 State v. Lyons,
 
 2009-2198 (La. 10/20/09), 18 So.3d 1293.
 

 [3]
 

 .At trial, the State indicated to the trial court that Officer Earls had left the force.
 

 [4]
 

 . Defendant was not arrested until a May 14, 2009 traffic stop.
 

 [5]
 

 . Det. DeLarge never located the firearm that was used to shoot the victim. No spent casings were on the scene, and police were unable recover the bullet or determine what kind of firearm was used. An empty handgun magazine, in 9mm or .380 caliber, was found right outside of the front door of the apartment, on the other side of the doorsill.
 

 [6]
 

 . Det. DeLarge testified on cross-examination that someone identifying himself as Joshua Lyons telephoned the detective from jail and told the detective that he, Lyons, had been in the apartment sleeping, and at some point prior to the shooting left and went across the street to see his girlfriend.
 

 [7]
 

 . Floyd admitted on cross-examination that the first time he met with someone from the District Attorney’s Office he stated that he did not know who shot him.
 

 [8]
 

 . At trial, Donnie Floyd identified the two respective photographic lineups in which he selected defendant’s and codefendant Joshua Lyons' photographs.
 

 [9]
 

 . On cross-examination, Floyd denied telling Det. DeLarge that defendant owed him two hundred dollars.
 

 [10]
 

 . At this point, counsel for defendant immediately objected and moved for a mistrial, which the court denied. Floyd admitted to prior convictions for simple burglary, first
 
 *936
 
 offense possession of marijuana, and attempted possession of a firearm by a convicted felon. Floyd also admitted that in March 2009 he was selling drugs.
 

 [11]
 

 . Floyd confirmed that he was advised by the prosecutor questioning him that by testifying he would be admitting to crimes that could send him to jail.
 

 [12]
 

 . When asked whether Floyd had told the detective that he had a gun on the day of the incident, Det. DeLarge replied that he did not remember asking Floyd. When asked whether Floyd ever told him that he had a gun on the day of the incident, the detective replied in the negative.
 

 [13]
 

 . A simple battery is a battery — the intentional use of force or violence upon the person of another — committed without the consent of the victim. La. R.S. 14:33; 14:35.
 

 [14]
 

 . It is well-settled that specific intent can be formed in an instant. However, there was no evidence defendant had ever threatened Floyd, either that day or at any previous point in time. Similarly, Joshua Lyons’ purported threat on Floyd’s life to Floyd’s parents cannot be imputed to defendant.