ROSEMARY LEDET, Judge.
Lin this criminal appeal, the defendant, Juan Canales, Sr., seeks review of his conviction and sentence for attempted manslaughter. For the reasons that follow, we affirm.

STATEMENT OF THE CASE

On June 20, 2012, Mr. Canales was charged by bill of information with attempted second degree murder of Marvin Tran, in violation of La. R.S. 14:27 and 14:30.1. On July 12, 2012, Mr. Canales entered a plea of not guilty. On August 16, 2012, at a preliminary hearing, the trial court found probable cause for the lesser charge of attempted manslaughter.
On May 8, 2013, at the conclusion of a two-day trial, a twelve-person jury found Mr. Canales guilty of attempted manslaughter, in violation of La. R.S. 14:27 and 14:31. On May 24, 2013, the trial court sentenced Mr. Canales to fifteen years with credit for time served.

STATEMENT OF THE FACTS

On May 26, 2012, at approximately 11:30 p.m., Mr. Tran and his brother, David Tran, went to the Shamrock Bar on Car-rolton Avenue in New Orleans, Louisiana to meet a few of David’s friends. Mr. Tran and David were celebrating 12David’s graduation; and they had gone to dinner and a movie before going to the Shamrock. Approximately five hundred to six hundred people were at the Shamrock that night. Mr. Tran testified that this was his first time visiting the Shamrock[1] and that he drank approximately three or four beers while he was there.
Jimmy Whitehead, a friend of Mr. Ca-nales’ from work, testified that he also went to the Shamrock that night to meet Mr. Canales and a few other friends. Mr. Whitehead testified that while he and Mr. Canales were sitting at a booth drinking beers, Mr. Canales pointed out Mr. Tran and said that he was afraid Mr. Tran would do something.[2] Mr. Whitehead testified that Mr. Canales was nervous and seemed afraid of Mr. Tran. He further testified that he was not sure how much Mr. Canales drank but he indicated that Mr. Canales did not appear to be drunk.
Jonathan Pennington, who went to high school with both Mr. Tran and Mr. Ca-nales, was bartending the side bar next to the men’s restroom at the Shamrock that night. He testified that early in the night Mr. Tran came up to him and ordered a drink and said hello. Later that night he also saw Mr. Canales. He testified that Mr. Canales ordered a Red Bull.[3] He also mentioned that Mr. Tran was at the bar and that they had “some kind of beef’ about an ex-girlfriend. Mr. Pennington told him to take it elsewhere and to not start anything at the Shamrock.[4]
*1186 | o Just before 8:00 a.m., Mr. Tran told Charles Badinger, one of David’s friends, that he was going to the bathroom. He walked across the bar to the bathroom and proceeded to use the urinal. As he was using the urinal, he felt someone standing behind him. When he stepped to the right and attempted to look back, he was suddenly struck on the side of the head by someone. Mr. Tran testified that the person kept hitting him so he turned around and started grabbing on the person’s shirt and hand to stop him. He was punched in his face and thought he was being punched in his body. He testified that the blows to his body felt weird and he took a step back and fell to his knees. At this point, he saw the knife[5] and realized it was Mr. Canales who was attacking him.[6] He testified that he attempted to catch Mr. Canales’ wrists at this point, but he missed. Mr. Canales then slipped, or somehow got on his knees, and hit Mr. Tran with the knife. Mr. Tran grabbed Mr. Canales’ wrists as hard as he could; he saw his own blood all around his body. He then looked Mr. Canales in the eyes and told him he did not have to do this and that it did not have to end like this. Mr. Tran testified that he kept calling God’s name. Somebody then pulled Mr. Canales off of him, and he heard the knife drop to the ground. Mr. Tran testified that he started to go into shock, and a female came on top of him and said not to move because his intestines were sticking out.
Mr. Pennington testified that when he was cleaning up that night, a customer came up to him and told him that someone was being stabbed in the bathroom. He 14told the door man who was working security, Andrew Armstrong, and a bartender standing next to him, Melissa Trahan. He also found the general manager, Eric Bornholdt, and called 911. He and Mr. Bornholdt realized that a police officer was already downstairs investigating a separate incident in the parking lot. They ran to get the officer.[7]
Meanwhile, Mr. Armstrong ran into the bathroom to assess the situation. He testified that when he first entered, he saw Mr. Tran hunched over on the ground with Mr. Canales on top of him. Mr. Armstrong noticed that Mr. Canales had a knife in his hand. He secured Mr. Ca-nales’ hand that was holding the knife and instructed him to let go of it. Mr. Canales complied and informed Mr. Armstrong that he was defending himself. Mr. Armstrong described Mr. Canales as calm and cooperative.[8] He noticed injuries to Mr. Tran, but he did not notice any injuries to Mr. Canales. Mr. Armstrong testified that he made sure the two were separated until the police arrived.
After hearing about the stabbing, Ms. Trahan looked for her boss and then ran to *1187 the bathroom. When she approached the door, Mr. Canales was coming out. She put her arms up and told him not to go anywhere. She testified that he lifted up his hands and walked around her. She then ran to the front door of the bar and screamed downstairs for her boss to get the officer before anyone got away. Quickly thereafter, Officer Micháel Duzmal and Mr. Bornholdt arrived.
IsOfficer Duzmal testified that when he entered the bathroom, he saw a very bloody floor and Mr. Tran, who had stab wounds.[9] Officer Duzmal also saw a Shamrock bouncer (Mr. Armstrong) holding back Mr. Canales; the bouncer stated that Mr. Canales was the one who stabbed Mr. Tran.[10] Officer Duzmal then arrested Mr. Canales and read him his Miranda rights.[11] He testified that Mr. Canales did not resist arrest.[12]
Mr. Armstrong, Mr. Bornholdt, and Ms. Trahan testified that Mr. Tran was going in and out of consciousness and that he kept muttering that Mr. Canales did this out of revenge because Mr. Tran testified (or was going to testify) against him in a molestation case. Several people placed pressure on Mr. Tran’s wound to try to stop the bleeding and to make sure he stayed awake until the Emergency Medical Services (the “EMS”) arrived to take him to the emergency room.
Dr. Lance Stake[13] treated Mr. Tran when he arrived at the LSU emergency room. Dr. Stake testified that because part of Mr. Tran’s intestine was hanging out, they took him straight to surgery. Dr. Stake testified that Mr. Tran had a single stab wound injury to his stomach and lacerations to his abdominal wall, which they repaired. Dr. Stake further testified that Mr. Tran’s injuries were not immediately | (¡life threatening; however, if Mr. Tran had not been treated he would have died over the course of several days from intra-abdominal sepsis. Dr. Stake also testified that Mr. Tran’s ethanol (alcohol) level was consistent with someone whom he would classify as “drunk.”
The day after the stabbing, Officer Duz-mal went to the hospital and took a statement from Mr. Tran, which was tran-. scribed by his brother David (the “Written Statement”). Mr. Tran was unable to write because of his injuries. Mr. Tran barely recalled giving the Written Statement, as he said he was on a great deal of medication. Further, David only vaguely remembered transcribing the statement.
A couple days later, Detective Kristie Harper was assigned to investigate the case.[14] On May 31, 2012, Detective Harper conducted an audio recorded interview of Mr. Tran (the “Recorded Statement”). Detective Harper testified that Mr. Tran *1188 was very emotional and that he had very graphic injuries. For the most part, Mr. Tran’s Recorded Statement tracked his trial testimony; however, there were a few discrepancies. One of the discrepancies was that Mr. Tran told Detective Harper during his Recorded Statement that the person who had been attacking him tried to retreat so he stopped him and then he was stabbed. At trial, Mr. Tran explained that he was not in the right state of mind during the Recorded Statement. He clarified that he was only trying to stop the attacker from hitting him, not to prevent him from leaving. Another discrepancy was that at no time during the Recorded Statement did Mr. Tran state that the knife Mr. Canales used could have been Mr. 17Tran’s knife. While at trial, Mr. Tran testified that it was his knife that Mr. Canales used.[15]
Mr. Tran testified — both in the Recorded Statement and at trial — that Mr. Ca-nales’ motive for the stabbing was revenge, because Mr. Tran was testifying against Mr. Canales in a molestation case.[16] In 2009, he contacted Mr. Canales, a high school acquaintance, because he wanted a job and had heard that Mr. Canales was making good money in Monroe. Mr. Tran then moved to Monroe. There, he lived with Mr. Canales, Mr. Canales’ wife, and her mother, Mr. Canales’ two biological children, and his thirteen-year old stepdaughter. Mr. Tran’s plan was to live with Mr. Canales’ family until he made enough money to move out. In February 2009, Mr. Tran witnessed Mr. Canales and . his step-daughter lying on the floor with Mr. Canales’ hand on her vaginal area. Mr. Canales made eye contact with Mr. Tran and told Mr. Tran that he was stretching out his step-daughter. He also told him that they would move to the bedroom. Mr. Tran said he then heard moaning from the bedroom. Mr. Tran testified that about twenty-five minutes later, Mr. Canales knocked on his door and asked him if he heard anything. A few days later, Mr. Tran told Mr. Canales’ mother-in-law what he witnessed. He testified that he did not call the police because he thought it was a family matter. About a week later, Mr. Canales was kicked out the house by his wife. When Mr. Tran asked him why, he said his stepdaughter made up lies about him.
|aMr. Tran testified that he got into an argument with Mr. Canales in 2010. During the argument, he called Mr. Canales a pedophile and told him that he believed his wife and his step-daughter. Mr. Tran testified that Mr. Canales later sent him several threatening text messages and made several harassing phone calls to him. Following these incidents, Mr. Tran and Mr. Canales were involved in a physical altercation in a lingerie shop in Monroe. Mr. Tran testified that Mr. Canales jumped in front of his face and pushed him. Mr. Tran then tried to swing at him, but he missed. Mr. Canales threw him to the ground and started hitting him. Mr. Tran was arrested as the aggressor; however, the charges were later dropped. Mr. Tran *1189 testified that he had not seen Mr. Canales since that incident.
Mr. Tran testified that he still suffers from medical problems as a result of the stabbing incident, such as digestion problems and emotional problems. He also testified that he moved to Texas after the stabbing incident because it was emotionally too hard for him to stay in Louisiana.

ERRORS PATENT

A review of the record for errors patent reveals one. According to La.C.Cr.P. art. 873, “[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.”
In the instant case, the trial court denied Mr. Canales’ motion for new trial; the trial court then stated “[w]aive delays in sentencing?” Mr. Canales’ counsel responded “[y]our honor, I believe some of the family wishes to present testimony |9before sentencing.” Defense counsel then proceeded to present testimony from two witnesses attesting to Mr. Canales’ character. In proceeding with introducing testimony for Mr. Canales’ sentencing rather than objecting to the court’s questioning of whether Mr. Canales was waiving the delay, Mr. Canales implicitly waived the delay required by La.C.Cr.P. art. 873.[17] Thus, no remedial action is necessary.

DISCUSSION

Assignment of Error Number 1

In his first and only assignment of error, Mr. Canales contends that the evidence was insufficient to prove beyond a reasonable doubt that he committed attempted manslaughter. He contends that the State failed to disprove that he acted in self-defense. He submits that the circumstances adduced at trial demonstrate that he withdrew from the conflict and that he was justified in defending himself against being attacked with a knife.
The standard for reviewing a sufficiency of the evidence claim is well-settled. This court summarized the standard as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole. If rational triers of fact could disagree as to the interpreta *1190 tion of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id. at 1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from the Jackson reasonable doubt standard; rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
State v. Jasper, 14-0125 (La.App. 4 Cir. 9/17/14), 149 So.3d 1239, 1246 (quoting State v. Brown, 12-0626, pp. 6-8 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 570-71).
The jury found Mr. Canales guilty of attempted manslaughter.[18] La. R.S. 14:31 A(l) defines manslaughter as “[a] homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive |nan average person of his self-control and cool reflection.”[19] An attempt occurs when the perpetrator “having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object.” La. R.S. 14:27. Specific intent is defined by La. R.S. 14:10(1) as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Specific intent may be “inferred from the defendant’s actions and the circumstances of the transaction.” State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18; see also State v. Barnes, 11-1421, p. 11 (La.App. 4 Cir. 9/19/12), 100 So.3d 926, 934, writ denied, 12-2251 (La.4/1/13), 110 So.3d 575.
In this case, Mr. Tran positively identified Mr. Canales as the man who attacked him in the bathroom, repeatedly hit him, and stabbed and cut him several times in the abdomen. The evidence was sufficient for the jury to return a verdict of attempted manslaughter. Nonetheless, Mr. Canales contends that the evidence did not disprove that he stabbed Mr. Tran in self-defense.
*1191 Self-defense is governed by La. R.S. 14:19 A, which provides that “the use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such | ^offense....”[20] Another relevant provision is La. R.S. 14:21, which provides that “a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.”
“In a non-homicide situation, the defense of justification requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; and (2) a subjective inquiry into whether the force was apparently necessary.” State v. Cooks, 11-0342, p. 11 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 939, writ denied, 12-0112 (La.5/18/12), 89 So.3d 1189 (citing State v. Fluker, 618 So.2d 459, 462 (La.App. 4th Cir.1993)).
Regardless of whether the State or the defendant bears the burden of proof regarding self-defense in non-homicide situations,[21] the evidence presented by the State was sufficient to prove beyond a reasonable doubt that Mr. Canales did not act in self-defense. See State v. Cooks, 11-0342, pp. 11-12, (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 939-40 (collecting cases).
The testimony and evidence introduced by the State proves that Mr. Canales did not act in self-defense. Mr. Tran was the only person to testify as to what | ^actually happened during the attack and stabbing. He testified that, unprovoked and unexpectedly, he was hit from behind on his head and face, and stabbed and cut several times in his abdomen. Mr. Tran testified that at no time did he pull out his knife on Mr. Canales. Further, he testified that he did not grab Mr. Canales and prevent him from leaving. Rather, he only tried to stop Mr. Canales from hitting him. This testimony defeats Mr. Canales’ self-defense argument.
Corroborating Mr. Tran’s testimony, Mr. Armstrong testified that it was Mr. Canales who was holding the knife and who was on top of Mr. Tran when he entered the bathroom. Moreover, the severe injuries Mr. Tran suffered, as opposed to the minor injuries Mr. Canales suffered, support Mr. Tran’s testimony that he was not the aggressor and that Mr. Canales was not acting in self-defense. Several Shamrock employees also testified that Mr. Tran kept saying, even in his nearly unconscious state, that Mr. Canales stabbed him out of revenge for testifying *1192 against him in a molestation ease. Lastly, Mr. Pennington testified that earlier in the night Mr. Canales expressed a problem with Mr. Tran and indicated his ill intentions. Based on this evidence, any rational trier of fact could conclude that Mr. Ca-nales was neither justified nor acting in self-defense in stabbing Mr. Tran.
Mr. Canales, however, contends that the events that occurred during the fight between himself and Mr. Tran were disputed. Mr. Canales notes that the knife used in the stabbing belonged to Mr. Tran and that it was unreasonable for the jury to find that he was able to see the knife and take it from Mr. Tran’s back pocket during the fight. He contends that Mr. Tran testified that he commonly used the knife when he was attacked. He contends that this evidenced a propensity by Mr. Tran to get into fights and to use his knife. He further contends that Mr. Tran had attacked him in the past.
114Mr. Canales also argues that Mr. Tran himself admitted in his Recorded Statement that Mr. Canales attempted to leave before the stabbing occurred but Mr. Ca-nales prevented him from leaving. Mr. Canales submits that at this point, Mr. Tran became the aggressor. Mr. Canales contends that only then did he use the knife to defend himself. Still further, Mr. Canales contends that he sustained “significant” injuries during the fight, while Mr. Tran’s injuries were not immediately life-threatening.
A reading of the transcript dispels these arguments. The fact that the knife belonged to Mr. Tran did not prove that Mr. Canales used it in self-defense. Contrary to Mr. Canales’ contention that it was unlikely that he knew about the knife and took it from Mr. Tran,' Mr. Tran testified that he carried the knife while he was working in Monroe and living with Mr. Canales. Further, Mr. Tran testified that the knife and clip were visible. Also contrary to Mr. Canales’ contention, Mr. Tran did not testify that he “commonly” used the knife when attacked. Rather, Mr. Tran testified that he carried the knife for cutting boxes and other things. He testified: “But I never really — when I get attacked, I don’t consider using it as a weapon.” Significantly, although Mr. Tran and Mr. Canales were, involved in a fight in Monroe that may have been started by Mr. Tran, Mr. Tran did not use his knife during that altercation.
With respect to Mr. Canales’ “significant” injuries, Officer Duzmal identified photographs of Mr. Canales’ injuries, which were taken by the defense within days of the incident. According to Officer Duzmal, the photographs showed that Mr. Canales had a minor cut on the interior of his hand, a small cut on his index finger that required two sutures, an abrasion on his knuckle, and a bit of bruising on his wrist. The photographs do not show any “significant” injuries. [ TfiFurther, Mr. Tran testified that he grabbed Mr. Ca-nales’ wrists in order to get the knife from him, which would explain these injuries. Also buttressing that Mr. Canales’ injuries were not significant, Mr. Armstrong testified that he did not notice any injuries on Mr. Canales when he pulled him off of Mr. Tran. By contrast, the photographs of Mr. Tran’s injuries show severe wounds, including stab wounds to the side and stomach. Indeed, Dr. Stuke testified that Mr. Tran’s intestine was protruding through one of the wounds. Dr. Stuke also testified that although the injuries were not immediately life-threatening, they would have been fatal if not promptly treated.
As noted, the defense claims that Mr. Canales started to retreat but Mr. Tran *1193 pulled him back into the fray, and that is when he used the knife to defend himself. In support, the defense points to the Recorded Statement, which Mr. Tran gave in the hospital four days after the stabbing. Specially, Mr. Tran stated that before he recognized his attacker, he grabbed the attacker as he tried to get away; however, Mr. Tran testified on cross-examination that he was “not in his right state of mind” when he gave this statement. Indeed, Detective Harper testified that Mr. Tran was very emotional when he made the statement. A review of the statement supports this assessment. At trial, Mr. Tran insisted that he grabbed his attacker to stop him from hitting him and not to keep him from getting away. Further, Mr. Armstrong described Mr. Canales as calm when he encountered him. This also dispels Mr. Canales’ contention that he stabbed Mr. Tran while in fear for his life.
The jury was aware of the discrepancies between Mr. Tran’s Recorded Statement and his trial testimony. The jury, nevertheless, rejected Mr. Canales’ argument that his stabbing of Mr. Tran was in self-defense. A factfinder’s credibility determination is entitled to great weight and should not be disturbed |1fiunless it is contrary to the evidence. State v. Johnson, 09-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 211. Given Mr. Tran’s physical and mental state at the time he gave his Recorded Statement, we find that the jury did not abuse its discretion in discrediting the defense’s arguments and finding that Mr. Canales’ actions were not justified.
Viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Canales was guilty of attempted manslaughter.

DECREE

For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. However, a bartender from the Shamrock testified that she heard Mr. Tran was a regular at the bar. Mr. Tran’s counsel accredited this mistake to the fact that the bartender was likely confusing Mr. Tran with his brother, David.

. Mr. Tran, however, testified that he did not see Mr. Canales at the Shamrock before he was attacked by him in the bathroom. He further testified that he did not know Mr. Canales would be at the Shamrock that night.

. While Mr. Pennington testified that he did not serve Mr. Canales alcohol, he testified that there were other bars in the Shamrock Mr. Canales could have ordered alcohol from that night.

. Mr. Pennington further testified that despite an accusation alleged by Mr. Tran, he never called Mr. Canales that night to let him know that Mr. Tran was at the Shamrock. Mr. Pennington also provided his phone records *1186 to show that he did not even have Mr. Ca-nales' phone number.

.The knife Mr. Canales used belonged to Mr. Tran. At trial, Mr. Tran testified that he was carrying a folding knife clipped to the back pocket of his cargo pants. He testified that the knife was visible and that he had carried this knife with him almost every day since 2008. He testified that he used the knife for his construction job and recreational activities, such as hunting and fishing. However, Mr. Tran did not mention that he carried a knife in his recorded statement or in his written statement, which were conducted days after the incident.

. Mr. Tran also identified Mr. Canales in court as the man who stabbed and attacked him at the Shamrock.

. Mr. Pennington testified that he did not know Mr. Canales and Mr. Tran were involved in the stabbing until he came back upstairs and saw Mr. Canales handcuffed;

. Mr. Tran also testified that during the attack Mr. Canales' eyes were quiet and cold.

. He also testified that Mr. Canales had swelling to the bridge of his nose, small cuts on his palm and his index finger, bruising on his wrist, and a small abrasion on his knuckle. He took Mr. Canales to the hospital later that night where he received two sutures on his right index finger. Officer Duzmal testified that it is standard procedure to take an arres-tee with an injury to the hospital before going to lock-up.

. On cross-examination, however, Officer Duzmal testified that his police report from the night of the incident made no mention of someone holding Mr. Canales back.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Officer Duzmal testified that he also interviewed several employees at the scene that night, including the body guard holding back Mr. Canales, the manager of the Shamrock, and two of the bartenders.

. The parties stipulated that Dr. Stuke is an expert in trauma surgery.

. Detective Harper investigated the case as "an aggravated battery by stabbing.”

. Some of the other minor discrepancies included the following: Mr. Tran told Detective Harper that he moved to Monroe to make money to start a business, but at trial, he testified that he moved to Monroe to pay off college loans. On cross-examination, however, he testified that it was for both reasons. Another discrepancy concerned how long he remained at Mr. Canales’ house in Monroe; the difference was only a few days.

. Following the Recorded Statement, Detective Harper called child services in Ouachita Parish. The representative at child services indicated that there were a couple of cases involving Mr. Canales, but these cases were closed and transferred to another parish. Further, she stated that Marvin Tran was not a listed witness in any of the cases.

. See State v. Flowers, 337 So.2d 469, 474 (La.1976) (holding that the defendant waived twenty-four hour delay for sentencing when court asked the defendant if he was ready for sentencing and the defendant answered in the affirmative); State v. Agee, 08-0203, p. 4 (La.App. 4 Cir. 7/23/08), 990 So.2d 95, 97 (holding that a defendant may implicitly waive the twenty-four hour delay by announcing his readiness for sentencing); State v. Cavazos, 11-0733, p. 8 (La.App. 4 Cir. 5/16/12), 94 So.3d 870, 878, writ denied, 12-1372 (La.10/26/12), 99 So.3d 645 and 12-1438 (La.10/26/12), 99 So.3d 645 (holding that the defendant waived the twenty-four hour delay when the judge asked if the defense had anything to say before sentencing and defense counsel responded that there was nothing to put on the record); see also State v. Harrison, 08-1110, p. 10 (La.App. 4 Cir. 6/25/09), 16 So.3d 447, 455; State v. Martin, 13-0115, p. 7 (La.App. 4 Cir. 12/4/13), 131 So.3d 121, 126, writ denied, 14-0004 (La.6/13/14), 140 So.3d 1186.

. Attempted manslaughter is a responsive verdict of attempted second degree murder, which Mr. Canales was charged with by bill of information. See La.C.Cr.P. art. 814.

. Second degree murder, as defined in La. R.S. 14:30.1, includes in pertinent part the killing of another when the offender has the specific intent to kill or inflict great bodily harm. Although second degree murder requires the specific intent either to kill or inflict great bodily harm, attempted second degree murder requires the specific intent to kill. See State v. Bishop, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437; State v. Coleman, 12-1408, p. 9 (La.App. 4 Cir. 1/8/14), 133 So.3d 9, 18; State v. Cooks, 11-0342, p. 10 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 939, writ denied, 12-0112 (La.5/18/12), 89 So.3d 1189.

. La. R.S. 14:19 A further states that it does not apply where the force or violence results in a homicide.

. There is a split in this court, as well as among the other Louisiana appellate courts, on the issue of who bears the burden of proof in non-homicide cases when the defendant claims he acted in self-defense. See State v. Fluker, 618 So.2d 459, 462-63 (La.App. 4th Cir.1993). In Fluker, this court held that when an issue of exculpatory circumstances exists, the State has burden to disprove such a claim. Thus, the Fluker court held that the State has the burden of disproving self-defense beyond a reasonable doubt in both homicide and non-homicide cases. Id. at 463. However, in State v. Wischer, 04-0325, pp. 8-9 (La.App. 4 Cir. 9/22/04), 885 So.2d 602, 606-07, this court held that in a non-homicide case the defendant carries the burden of proving the affirmative defense that he acted in self-defense by a preponderance of the evidence. Nevertheless, we find it unnecessary to resolve this conflict, as the State presented sufficient evidence to prove that Mr. Canales did not act in self-defense.