ROSEMARY LEDET, Judge.
Lin this criminal case, the defendant, Frederick Ross, appeals his conviction and sentence for three counts of attempted second degree murder and one count of discharging a firearm during a violent crime. For the reasons that follow, we affirm.

STATEMENT OF THE CASE

On July 23, 2010, Mr. Ross was charged by bill of information with one count of attempted second degree murder, two counts of aggravated battery, and one count of discharging a firearm during a violent crime. On July 28, 2010, he pled not guilty. On January 21, 2011, the district court found probable cause. On March 8, 2011, the defense filed a motion to quash on double jeopardy grounds, which the district court denied on April 18, 2011. On May 24, 2011, the State filed a motion in limine to prohibit Mr. Ross from applying makeup to his facial and neck tattoos. The State also amended counts two and three of the bill of information to reflect that Mr. Ross was charged with two additional counts of attempted second degree murder. Mr. Ross then re-entered a plea of not guilty. |2On June 6, 2011, the district court denied defense counsel’s motion to continue the trial. This court denied Mr. Ross’s writ application seeking review of that ruling. State v. Ross, 11-0740 (La.App. 4 Cir. 6/7/11) (unpub.). Mr. Ross’s trial began that same day and concluded on June 8, 2011. The jury found Mr. Ross guilty as charged. On July 11, 2011, the district court denied Mr. Ross’s motions for new trial and post-verdict judgment of acquittal. After waiving delays, Mr. Ross was sentenced to serve fifty years at hard labor on each of his convictions for attempted second degree murder and to serve twenty years at hard labor on his conviction for discharging a firearm. The sentences were ordered to run concurrently and to be served without benefit of parole, probation or suspension of sentence. This appeal followed.

STATEMENT OF THE FACTS

On the afternoon of May 20, 2010, Dijon Cloud, Shakara Peters, and Percy Newman (the “trio”) were standing on the corner of Pauger and North Roman Streets in New Orleans. Ms. Peters is Ms. Cloud’s cousin, and she was visiting from Texas. Ms. Cloud, then nineteen years old, was standing on the steps of a residence located at 2500 Pauger Street and talking on her cell phone. Ms. Peters and Mr. Newman were standing on the side of the residence and flirting with each other. As the trio was standing on the corner, Mr. Ross, driving a red or burgundy colored four-door sedan, circled the block four times. On his fourth pass, he looked directly at Ms. Cloud, pulled out a gun, and began shooting. Several shots were fired, and the trio suffered gunshot wounds to their legs. The gunshot wound that |sMs. Cloud suffered required three surgeries and a ten-day hospital stay. Her leg was badly injured because the bullet entered her thigh and exited in the area of her knee. Ms. Peters and Mr. Newman suffered superficial wounds. Only Ms. Cloud testified at trial; neither Ms. Peters nor Mr. Newman testified.
Ms. Cloud knew Mr. Ross personally; they shared mutual friends. Although Ms. Cloud did not date Mr. Ross, she acknowl *619 edged having sex with him on one occasion. Ms. Cloud denied ever meeting any of Mr. Ross’s relatives. She also testified that she had not seen Mr. Ross for several months before the shooting.
Ms. Cloud’s little brother, Justin Cloud (who was thirteen years old at the time of trial), testified that he was returning from the corner store when the shooting began. When he heard gunshots, he hid. Nonetheless, he was able to see the driver of a red car firing shots down Pauger Street. He also saw the driver back up and fire additional shots. After the shooting stopped, Justin Cloud ran to assist his sister, who had collapsed in the street.
Joseph Peters, Ms. Peters’ cousin, was sitting on the steps of his residence located at 2515 Pauger Street talking with some neighbors. When he heard shots being fired, he jumped from the steps, and hid near his pickup truck that was parked in front of his residence. Mr. Peters looked up briefly and saw that the shots were being fired from a burgundy colored car that backed up, firing more shots. After the shooting ended, he could see that possibly three people had been shot. His cousin, Ms. Peters, approached him. She had been shot in the leg, and she was terrified. Mr. Peters called 911, and he sat with Ms. Peters on the tailgate |4of his truck until the ambulances arrived. One of the bullets fired during the shooting entered the living room window of Mr. Peter’s residence, and it was found on his sofa. His residence was across the street and two doors down from the corner where the trio was standing just before the shooting.
Detective Nathan Gex was the lead detective on the case; he was the first officer to arrive on the scene. When he arrived, he observed Ms. Cloud on the ground in agony, and a large pool of blood. She told Detective Gex that “Fred” shot her and that he lived in the general vicinity on Elysian Fields Avenue.
Detective Gex found another victim, Ms. Peters, sitting near a pickup truck that was in front of 2515 Pauger Street; a relative was tending to her. Ms. Peters informed the detective that she saw the shooter but did not know his name. She also told the detective that she could identify the shooter from a photograph.
The third victim, Mr. Newman, ran to a nearby relative’s house after he was shot. He re-appeared on the scene, but was uncooperative when questioned by Detective Gex. Mr. Newman told the detective that he did not see who fired the shots and that a green vehicle was involved. The trio was transported to University Hospital.
Detective Gex observed that the residence on the corner of Pauger and North Roman Streets (at 2500 Pauger) had several bullet holes in the wall and a bullet hole in the front door. He also saw that a bullet traveled through the living room window at 2515 Pauger Street and landed on the sofa.
[ RWhile in the emergency room, Ms. Cloud provided Mr. Ross’s address as 1721 Elysian Fields Avenue. After receiving this information, Detective Gex developed a six-person photographic lineup. The lineup was shown separately to Ms. Cloud and Ms. Peters while they were still in the emergency room. Both victims immediately identified Mr. Ross as the person who shot them. Detective Gex then obtained an arrest warrant for Mr. Ross and a search warrant for the Elysian Fields Avenue address. The search warrant was executed the morning after the shootings. Mr. Ross’s grandmother was there; Mr. Ross was not present. An attempt to execute the arrest warrant at the Elysian Fields Avenue address was unsuccessful *620 because Mr. Ross no longer lived there. On May 24, 2010, four days after the shooting, Mr. Ross turned himself in at Central Lockup.
Eight spent cartridges were recovered at the scene. These cartridges and six bullets were examined by Deputy Tommy Morse, who was qualified as an expert in the field of ballistics comparison and firearm examinations. Deputy Morse determined that all of the cartridges and three of the bullets came from the same forty caliber weapon. Three of the bullets were unsuitable for testing. No firearm was recovered.
At the close of the State’s case, the defense moved for a directed verdict as to counts two and three involving the attempted second degree murders of Ms. Peters and Mr. Newman. The motion was denied, and the defense presented its case.
|fiThe first defense witness to testify was Mr. Ross’s grandmother, Anna May Brown. She testified that Mr. Ross used to live with her at the Elysian Fields Avenue address; he moved out approximately four weeks before the shootings. Ms. Brown stated that she had met Ms. Cloud. She explained that Ms. Cloud would frequently come to the house, knock on the door, and ask for Mr. Ross. She specifically recalled that one night (around 11:00 p.m.) in December of 2009 she was leaving for work — she was a duty nurse — when she encountered Mr. Ross and Ms. Cloud on the front steps of her house. Before leaving, she warned Mr. Ross not to bring anyone into her house. Although she drove away, she returned to the house on a suspicion. She entered the house and found Mr. Ross and Ms. Cloud in her bedroom having sex. After Ms. Cloud was dressed, Ms. Brown threw her out of the house. Thereafter, Ms. Cloud still came to the house looking for Mr. Ross. Ms. Brown recalled the police busting into her house the morning after the shootings looking for Mr. Ross. She stated that she was never shown a search warrant even though she inquired whether the officers had one.
A private investigator, Eddie Guy, also testified for the defense. Mr. Guy testified that the gun strikes to the house located at the corner of Pauger and North Roman Streets were approximately knee high.

DISCUSSION

ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER ONE

17Mr. Ross contends that the evidence was insufficient to establish that he had the specific intent to kill with regard to counts two and three, which involved Ms. Peters and Mr. Newman. In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires the court to determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984); see also State v. Brown, 03-0897, p. 18 (La.4/12/05), 907 So.2d 1, 22; State v. Batiste, 06-0875, p. 7 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 814; State v. Sykes, 04-1199, 04-0947, p. 6 (La.App. 4 Cir. 3/9/05), 900 So.2d 156, 161. When the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude *621 every reasonable hypothesis of innocence.’ ” State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657.
A conviction for attempted second degree murder requires proof that the offender had the specific intent to kill. State v. Sullivan, 97-1037, p. 20 (La.App. 4 Cir. 2/24/99), 729 So.2d 1101, 1111; State v. Hongo, 96-2060, pp. 2-3 (La.12/2/97), 706 So.2d 419, 420-21. Specific criminal intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and |sthe conduct of the defendant. La. R.S. 14:10(1); State v. Bishop, 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437.
Mr. Ross argues that the State failed to show he had the requisite intent to kill Ms. Peters and Mr. Newman given that both suffered minimal injuries and that both were able to walk away from the scene. He emphasizes that neither Ms. Peters nor Mr. Newman testified at trial.
The State counters that Mr. Ross’s arguments lack merit because the evidence presented at trial proved that he had the requisite intent to kill Ms. Peters and Mr. Newman under the theory of transferred intent. The theory of transferred intent allows Mr. Ross’s state of mind towards his intended victim, Ms. Cloud, to be transferred to Ms. Peters and Mr. Newman. In this case, it is undisputed that Mr. Ross had the specific intent to kill Ms. Cloud when he pointed a gun directly at her at close range and began firing several shots. See State v. Cooks, 11-0342, p. 17 (La.App. 4 Cir. 12/4/11), 81 So.3d 932, 942, writ denied, 12-0112 (La.5/18/12), 89 So.3d 1189.
The doctrine of transferred intent provides that “[w]hen a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim.” State v. Strogen, 35,871, p. 4 (La.App. 2 Cir. 4/3/02), 814 So.2d 725, 728 (citing State v. Jasper, 28,187, p. 18 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, 566-67). This court applied the doctrine of transferred intent in State v. Norfleet, 96-2122 (La.App. 4 Cir. 10/21/98), 721 So.2d 506, a first degree murder case, in which the defendant intended to shoot a person, who had beaten up his sister, but accidentally shot someone walking with that person.
Applying the doctrine of transferred intent to the facts of this case, Mr. Ross’s specific intent to shoot Ms. Cloud was transferred when he accidentally also shot Ms. Peters and Mr. Newman. Despite the failure of Ms. Peters and Mr. Newman to testify at trial, the fact that they were injured by gunshots fired by Mr. Ross was established through the testimony of Detective Gex and Mr. Peters. Ms. Peters and Mr. Newman required medical attention and were transported to University Hospital. The extent of their injuries is inconsequential. This assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE

By both of these assignments of error, Mr. Ross contends that Article I, § 17 of the Louisiana Constitution, which allows for non-unanimous jury verdicts, violates his constitutional rights. Louisiana Con *622 stitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782(A) provides that “[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
|inMr. Ross was charged with three counts of attempted second degree murder and one count of discharging a firearm during a violent crime; both statutes mandate that a sentence of hard labor be imposed. La. R.S. 14:27 (attempt); La. R.S. 14:30.1; La. R.S. 14:94(F). A jury of twelve was empaneled in this case and rendered a unanimous verdict as to count one, and verdicts of ten to two as to counts two and three (attempted second degree murder). A unanimous verdict was rendered as to count four (discharging a firearm during a violent crime). Thus, the proper number of jurors concurred in all the verdicts.
In assignment of error number two, Mr. Ross argues that non-unanimous jury verdicts violate the 14th Amendment Equal Protection Clause because the enactment of the provision was motivated by an express and overt desire to discriminate against African-Americans on account of race. In assignment of error number three, Mr. Ross argues that the allowance of non-unanimous jury verdicts violates his right to a jury trial under the 6th and 14th Amendments. Neither assignment of error number two nor number three was raised in the trial court. “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841(A). Thus, these assignments of error were not preserved for appellate review.
ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error, Mr. Ross asserts that the district court erred in granting the State’s motion in limine preventing him from covering his facial teardrop tattoos with makeup during the trial. The record reflects that the State |nfiled its motion in limine on May 24, 2011. Defense counsel acknowledged that he planned to cover Mr. Ross’s facial tattoos with makeup during trial. Although defense counsel noted his intent to present an argument against the State’s motion in limine, the district court moved on to other matters that day, and the motion in limine was not brought up again by either the State or defense counsel. No ruling was ever rendered on the motion in limine, and defense counsel lodged no objection to the district court’s failure to rule on the motion. Thus, this issue was not been preserved for appellate review. La. C.Cr.P. art. 841.
Regardless, even if the issue was properly preserved for review, this assignment of error is without merit. Mr. Ross specifically urges that the State sought to have the tattoos remain uncovered by makeup during trial as evidence of his bad character, evidence of other crimes that he may have committed, or both. Citing Wikipedia, Mr. Ross notes that the teardrop tattoos under his eye can indicate the number of killings he perpetrated, the number of years that he served in prison, or the loss of a loved one or fellow gang member.
The introduction of other crimes evidence is regulated by La. C.E. art. 404(A), which provides (with exceptions) that “[e]vidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the *623 purpose of proving that he acted in conformity therewith on a particular occasion.” Likewise, La. C.E. art. 404(B) prohibits evidence of other crimes, wrongs or acts to prove the character of a person. Other crimes evidence generally is inadmissible because of the risk that the trier of fact will convict the defendant of 112the immediate charge based on his other criminal acts. State v. Jones, 99-0861, p. 17 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 40. The erroneous admission of other crimes evidence is subject to the harmless error rule. State v. Robertson, 06-1537, pp. 8-9 (La.1/16/08), 988 So.2d 166, 171-72 (citing State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102); State v. Shaw, 07-1427, p. 25 (La.App. 4 Cir. 6/18/08), 987 So.2d 398, 412. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely not attributable to that error. Robertson, 06-1537 at p. 9, 988 So.2d at 172.
Mr. Ross cited to no jurisprudence that would support his argument that he was unduly prejudiced by the exposure of his tattoos to the jury. The only jurisprudence he cited was Justice Johnson’s dissent from the denial of rehearing in State v. Wells, 09-2595 (La.12/3/09), 24 So.3d 187. In her dissent, Justice Johnson found the State’s action in seeking to introduce a recorded phone conversation between the defendant and an unidentified female referencing a tattoo on his head to be an attempt to introduce impermissible character evidence. In the phone conversation, the defendant declined to say over the phone what the tattoo that he had acquired while in prison said. The defendant, however, stated that it was similar to the charges filed against him. The tattoo read “assassin,” and he was charged with first degree murder.
In the instant case, the State’s motion in limine sought to have Mr. Ross’s tattoos exposed at trial. In support, the State urged that the tattoos were distinctive to Mr. Ross and relevant to the issue of identification. The only reference to Mr. LkRoss’s tattoos during trial was when Ms. Cloud identified him in court; she pointed him out in the courtroom by noting the red tie that he wore and the tattoos on his face. This case thus is clearly distinguishable from Wells. No testimony was elicited as to the meaning of the teardrop tattoos on Mr. Ross’s face. Cf. State v. Williams, 06-1327, pp. 35-37 (La.App. 4 Cir. 1/23/08), 977 So.2d 160, 180 (finding harmless repeated references by the State as to what the teardrop tattoos on the defendant’s face meant). Furthermore, Mr. Ross was unequivocally identified as the person who fired the gunshots that struck the trio. It is unreasonable to suggest that the jury was inclined to convict Mr. Ross of attempted second degree murder because he had teardrop tattoos on his face. Thus, even had the district court erroneously granted the State’s motion in limine, it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was not attributable to that error. This assignment of error is without merit.

DECREE

For the forgoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED