| STATE OF LOUISIANA | * | NO. 2019-KA-0319 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| TYRONE T. DUCKETT | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 536-589, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Regina Bartholomew-Woods, Judge Dale N. Atkins)

Leon Cannizzaro
DISTRICT ATTORNEY
ORLEANS PARISH
Donna Andrieu
CHIEF OF APPEALS
ORLEANS PARISH
Irena Zajickova
ASSISTANT DISTRICT ATTORNEY
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P.O. Box 4015
New Orleans, LA 70178-4015

      COUNSEL FOR DEFENDANT

                      **AFFIRMED**
             **DECEMBER 18, 2019**

Defendant, Tyrone Duckett ("Defendant"), appeals his convictions and sentences for one count of second-degree murder, one count of attempted second-degree murder, and one count of obstruction of justice. For the reasons that follow, we affirm Defendant's convictions and sentences.

## PROCEDURAL HISTORY

On August 17, 2017, Defendant was indicted on three counts: the second-degree murder of Ferniqua Johnson; the attempted second-degree murder of Damion Blanton; and obstruction of justice, violations of La. R.S. 14.30.1, La. R.S. 14:(27)30.1 and La. R.S. 14:130.1, respectively.[1]

Following a jury trial, Defendant was found guilty on all counts. On October 23, 2018, the district court sentenced Defendant to life imprisonment for the second-degree murder of Ferniqua Johnson; the maximum statutory limit of fifty years imprisonment for the attempted second-degree murder of Damion Blanton; and the maximum statutory limit of forty years imprisonment for obstruction of

---

[1] Defendant's co-defendant, Raekeda Wright, was also indicted on one count of second-degree murder, one count of attempted second degree murder, and one count of obstruction of justice. On August 30, 2018, she pled guilty to a charge of manslaughter under La. R.S. 14:31 and was sentenced to 16 years at hard labor. The remaining charges were dismissed.

justice. The district court further ordered that all sentences run consecutively. This appeal followed.

## STATEMENT OF FACTS

At trial, Detective Jamaane Roy of the New Orleans Police Department ("NOPD") Homicide Division testified that, on the evening of May 1, 2017, he was dispatched to the 1600 block of Spain Street in response to a shooting. When he arrived on the scene, he learned that one victim, Ferniqua Johnson, was found deceased in the back of a shotgun-style residence located on North Claiborne Avenue, around the corner from the crime scene. Det. Roy testified that he observed a trail of blood splatter from the crime scene to the house that led through the residence where Ms. Johnson's body was located. Det. Roy also located three spent casings and five live rounds at the crime scene, which he testified he sent to the NOPD ballistics lab for testing.

Det. Roy testified he learned there was a second victim of the shooting who had already been transferred to University Medical Center for treatment of his injuries. Det. Roy met with the second victim, Damion Blanton, at University Medical Center. Mr. Blanton informed Det. Roy that there were two people involved in the shooting: an African American female with bright red hair and an African American male with "jacked up teeth."

Det. Roy obtained two surveillance videos from a residence on Spain Street. The videos showed Mr. Blanton walking on Mandeville Street and then turn onto Derbigny Street before taking a right onto Spain Street while constantly looking behind him. A gold Toyota or Lexus with dark tinted windows and aftermarket rims could be seen following Mr. Blanton in the video. Eventually, the video showed Mr. Blanton running while the gold car stops and a male front seat

2

passenger wearing a dark colored shirt, jeans, and tennis shoes could be observed exiting the vehicle with what appeared to be a bulge in the waistband of his pants before getting back into the vehicle after the car appeared to go around the block. The gold car was also observed pulling into a driveway of a house at the corner of Derbigny and Spain Streets and stopping while the driver of the vehicle got out to look in an alley before getting back in the vehicle and driving away. Eventually, the front seat passenger could be seen exiting the vehicle again and walking up St. Roch Street.

At another point in the video, Mr. Blanton could again be seen walking up Spain Street with Ms. Johnson and an unknown male. A male brandishing a weapon is then seen on the video. Det. Roy testified he believed the man with the weapon was the same man seen exiting the gold vehicle based on the fact that the clothing was the same. The man then fires the weapon at Mr. Blanton and Ms. Johnson. Mr. Blanton is then seen running up Spain Street toward North Claiborne Avenue, while Ms. Johnson falls to the ground. The video then shows the shooter standing over Ms. Johnson attempting to fire another shot before leaving. Ms. Johnson is then seen rising from the ground and walking up Spain Street toward Claiborne Avenue.

Det. Roy also went to Jack's Meat Market, a store located approximately two blocks from the house where Ms. Johnson's body was found. There, he obtained surveillance video from the day of the shooting and observed an African American female with bright red hair at the store that day. The store clerk at Jack's Meat Market informed Det. Roy that he knew the woman as "Kayla" and that she had a boyfriend who was known as "Tee." Det. Roy also obtained surveillance video from inside the store and observed a man fitting the description Mr. Blanton

gave of the shooter who also appeared to be wearing the same clothing as the shooter from the other surveillance video of the shooting. Det. Roy obtained a still shot of the suspect from the video and published it to the media.

Through his investigation of the shooter's accomplice known as "Kayla," Det. Roy eventually obtained the name of a possible female suspect—Raekeda Ikerria Kayla Wright. Det. Roy obtained a photograph of Ms. Wright and compiled a photographic line-up including the photograph, which he showed to Mr. Blanton. Mr. Blanton identified Ms. Wright as the driver of the vehicle. Det. Roy then obtained an arrest warrant for Ms. Wright, who was arrested approximately seven days after the shooting.

At the time of her arrest, Ms. Wright gave a statement to Det. Roy in which she identified herself as the woman with the red hair from the surveillance video from Jack's Meat Market, but denied being involved in any shooting. Likewise, Ms. Wright denied being in a relationship with a man known as "Tee." She also had a cell phone, which was confiscated.

Det. Roy obtained a search warrant for the contents of Ms. Wright's cell phone. He testified that he had the phone "dumped" and obtained all of the contents that were stored in the phone. Through the phone dump, Det. Roy testified he was able to see multiple videos and photos of Ms. Wright with one man. In at least one photo, Ms. Wright labeled the man as "Zaddyyy" (sic). Det. Roy testified that the man in the videos and photos appeared to be Defendant. Det. Roy also testified that he was able to determine that Ms. Wright communicated by text with a number labeled as "Zaddy" in her phone 488 times in the two weeks surrounding the shooting. In these conversations, "Zaddy" referred to Ms. Wright as "Kayla" on some occasions and, on other occasions, she referred to him as "Tyrone." Ms.

4

Wright discussed moving a car on the day after the shooting with "Zaddy" and there was also at least one photo of a gold Toyota Camry in Ms. Wright's phone with a man that appeared to be Defendant sitting in the driver's seat. Det. Roy testified that the phone dump data showed that at some point, a person who identified himself as "Tee" contacted Ms. Wright from a second phone number.

Det. Roy also testified that, after Ms. Wright was arrested, she made phone calls from jail to a person she referred to as "Zaddy" while she referred to herself as "Kayla." The phone calls Ms. Wright made to "Zaddy" were entered into evidence at trial. In the phone calls, "Zaddy" can be heard asking Ms. Wright "What did they say about me?" to which Ms. Wright responds: "They rattin'." Later, Ms. Wright can be heard telling "Zaddy" to "throw the phones away." Later, "Zaddy" tells Ms. Wright that he "ditched" the phone.

Det. Roy testified that he ran the phone number of the man Ms. Wright called from jail whom she referred to as "Zaddy" and the number was registered to the Defendant. Det. Roy testified that he then obtained a photograph of Tyrone Duckett, compiled a photographic line-up including the photograph, and presented it to Mr. Blanton. Mr. Blanton positively identified Defendant as the shooter. On the basis of Mr. Blanton's identification, Det. Roy issued a warrant for Defendant's arrest.

Defendant was arrested pursuant to the warrant approximately two weeks after the shooting. He gave a statement to Det. Roy. According to Defendant, he was not the shooter, and he denied he was "Kayla's" boyfriend. He denied that he had ever been inside the gold car. He claimed that he heard around the street that it was "Kayla" and her boyfriend—a man he knew as "Tank"—who committed the shootings.

Dr. Erin O'Sullivan, who was qualified as an expert in forensic pathology, testified at trial that she performed an autopsy on Ms. Johnson and she located three gunshot wounds to Ms. Johnson's neck, shoulder, and trunk. Dr. O'Sullivan opined that Ms. Johnson's cause of death was multiple gunshot wounds and classified it as a homicide.

Sean McElrath, who was qualified as an expert in firearms and ballistics testing, testified at trial that, of the five specimens that were submitted to him for testing—including what he identified as three spent .22 caliber casings recovered from the scene, an unknown projectile recovered from Mr. Blanton's body, an unknown projectile recovered from Ms. Johnson's body, a bullet fragment recovered from Ms. Johnson's body, and lead fragments recovered from Ms. Johnson's body—he could conclusively say that all, but the bullet fragment, were fired from the same weapon.

Raekeda Wright, who also goes by the name "Kayla," testified[2] that she was in a romantic relationship with Defendant at the time of the shooting and that they shared a car—a gold vehicle, which she positively identified as the gold car shown in the surveillance videos. She testified that, on the day of the shooting, she was in the neighborhood earlier in the day, that she left and then returned to find Defendant playing dice. Ms. Wright stated that Defendant entered her gold vehicle after finishing the dice game and that he seemed upset because he had lost money. Ms. Wright testified that she did not know at the time that Defendant was planning on shooting anyone, but that she did suspect that "something was up." Defendant told her to drive around the block, which she did. She testified that she let

---

[2] Ms. Wright testified that she entered into a Memorandum of Understanding with the State in which she agreed to testify truthfully in Defendant's trial in exchange for a reduction in her second-degree murder charge to manslaughter, to which she had already entered a guilty plea.

Defendant out of the vehicle twice when he asked to her to and that, when he re-entered the vehicle the second time, she saw that he had a gun. He told her it had jammed.

Following the shooting, Ms. Wright testified she and Defendant continued to communicate from various numbers via text message. Ms. Wright testified they discussed moving the vehicle. She testified that her original statement to Det. Roy that she was not in a romantic relationship with Defendant and was not involved in the shooting was not truthful and that she lied because she loved Defendant and was afraid that he would retaliate against her or her family if she told the truth. Ms. Wright identified Defendant as the shooter on the surveillance video. Finally, she testified that, while she was at one point in a romantic relationship with a man called "Tank," she was not in a relationship with him at the time of the shooting and he was in jail at the time of the shooting. Mike Reese of the Louisiana Office of Probation and Parole also testified he determined that "Tank"—whose given name is Cedrick Wright—was incarcerated at the time of the shooting.

Mr. Blanton testified that, at the time of the shooting, he was living at the corner of North Claiborne Avenue and Spain Street. He testified that, on May 1, 2017, he played dice with some people from the neighborhood, including Defendant, and he won two to three thousand dollars. He testified that he knew Defendant from seeing him around the neighborhood, but he did not know Defendant well.

Mr. Blanton identified himself on the surveillance video of the shooting, saying he was shot in the buttocks. Mr. Blanton also identified Ms. Johnson on the video and said that he was walking with her on Spain Street on the evening of the shooting because he had seen someone following him in a gold car, and he called

his girlfriend to walk home with him. Ms. Johnson came to walk home with him instead. Mr. Blanton also testified that he asked a third male to walk with them because Mr. Blanton knew he carried a gun. Mr. Blanton further testified that he saw the shooter coming at him and saw that the shooter had "messed up" teeth and was wearing a black shirt. He identified Defendant as the shooter, saying he was one hundred percent positive it was him.

Finally, Ms. Johnson's mother, Ms. Catrice Johnson, testified that her daughter was a good person who "had a past" and was not "an angel" but that she would give you the shirt off her back. Ms. Catrice Johnson identified a picture of Ms. Johnson playing basketball and stated that Ms. Johnson played basketball at Temple University.

## ERRORS PATENT

Pursuant to La. C.Cr.P. art. 920, a review of the record does not reveal any errors patent.[3]

## DISCUSSION

On appeal, Defendant assigns two errors for review. First, Defendant contends the trial court abused its discretion in admitting Ms. Catrice Johnson's testimony. Second, Defendant argues that the consecutive sentences imposed by the district court are excessive. We address Defendant's assignments of error in turn.

---

[3] La. C.Cr.P. art. 920(2) provides that an error patent is "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

**Assignment of Error Number One – Admission of Catrice Johnson's Testimony**

In his first assignment of error, Defendant asserts that the district court abused its discretion in admitting "victim-impact" testimony from Ms. Johnson's mother, Ms. Catrice Johnson, into evidence during the guilt phase of trial. Defendant contends that Ms. Catrice Johnson's testimony was irrelevant to the facts of his case and that it served to unfairly prejudice the jury against him, violating his rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, §16 of the Louisiana Constitution.

The State counters that Ms. Catrice Johnson's testimony was offered to "humanize" Ferniqua Johnson and as "proof of life" evidence, which constituted harmless error even if it was erroneously admitted. We agree.

We need not consider whether Ms. Catrice Johnson's testimony constituted impermissible "victim-impact testimony" because we find that the district court's admission of her testimony was harmless error. Admission of erroneous evidence is subject to harmless error analysis and "the test for determining harmless error is 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *State v. Hugle*, 2011-1121 p. 19 (La. App. 4 Cir. 11/7/12) 104 So.3d 598, 613 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)). "[T]rial error occurs during the presentation of the case to the [jury] and may be quantitatively assessed in context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt." *State v. Johnson*, 1994-1379 p. 14 (La. 11/27/95), 664 So.2d 94, 100-01.

The evidence of Defendant's guilt is overwhelming. "To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1)

intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death." *State v. Bishop*, 2001-2548 (La. 1/14/03), 835 So. 2d 434, 437; La. R.S. 14:30.1; La. R.S. 14:27. "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *Id.*; La. R.S. 14:10(1); *State v. Butler*, 322 So.2d 189 (La.1975); *State v. Martin*, 92-0811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411.

As to the charge of second degree-murder of Ferniqua Johnson, both Mr. Blanton and Ms. Wright provided unrefuted testimony at trial that Defendant was the individual who shot and killed Ms. Johnson. Specifically, Mr. Blanton testified that he observed the person who shot both him and Ms. Johnson, that he knew the person from around the neighborhood because he had seen him on multiple occasions, and positively identified Defendant as the shooter, stating he was one hundred percent positive Defendant shot him and Ms. Johnson. Likewise, Ms. Wright testified that Defendant ordered her to drive around the block of the location of the murder and to let him out of the vehicle twice on that evening. She testified that Defendant was upset over losing money in a dice game—thus providing motive for the shooting—and that when the defendant entered her car again after she dropped him off the second time, she observed he had a gun. She also stated that following the shooting, she and Defendant discussed moving her vehicle and destroying evidence from the shooting, such as Defendant's cell phone.

Surveillance video offered at trial corroborated Ms. Wright's and Mr. Blanton's testimony. Video captured at Jack's Meat Market and the residence on Spain Street on the day and evening of the shooting showed that both Defendant and Ms. Wright were in the neighborhood on the day of the shooting. It also depicted Mr. Blanton being followed by a gold car—identified by Ms. Wright as

hers and Defendant's car, which she was driving at Defendant's direction—and showed an individual firing shots at Ms. Johnson and Mr. Blanton. The video further depicted Ms. Johnson falling to the ground after being shot and the shooter appearing to stand over her body and attempting to shoot her again. Text messages between Defendant and Ms. Wright indicated that Defendant shot Ms. Johnson, and they discussed leaving town and moving the vehicle used during the commission of second-degree murder.

In order to support a conviction for attempted second-degree murder, the State must again prove that Defendant committed an overt act meant to accomplish the victim's death and did so with the specific intent to kill. *State v. Bishop*, 835 So. 2d 434, 437. "Although the statute for the completed crime of second degree murder allows for a conviction based on 'specific intent to kill or to inflict great bodily harm,' La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *Id.*

As to the charge of attempted second-degree murder of Mr. Blanton, the jury heard testimony from Mr. Blanton that he sustained a gunshot wound to his buttocks after Defendant shot him. Mr. Blanton testified that he had won a substantial amount of money from Defendant in a dice game on the day of the shooting, which gives Defendant a motive, and establishes intent to commit murder. Defendant's intent to murder his intended victim, Mr. Blanton, was transferred to his other victim, Ms. Johnson. *See State v. Cooks*, 11–0342, p. 17 (La.App. 4 Cir. 12/4/11), 81 So.3d 932, 942, *writ denied*, 12–0112 (La.5/18/12), 89 So.3d 1189; *State v. Ross*, 2012-0109 (La. App. 4 Cir. 4/17/13), 115 So. 3d 616, 621, *writ denied,* 2013-1079 (La. 11/22/13), 126 So. 3d 476.

There is more than ample evidence to support Defendant's conviction for obstruction of justice, which requires proof that "the perpetrator merely knows that an act 'reasonably may' affect a 'potential' or 'future' criminal proceeding." *State v. Bradley*, 2018-0734, p. 3 (La. App. 4 Cir. 5/15/19), 272 So. 3d 94, 98 (quoting *State v. Jones*, 2007-1052, p. 9 (La. 6/3/08), 983 So.2d 95, 101. Ms. Wright's recorded jailhouse phone calls between she and Defendant while she was incarcerated show that both she and Defendant plotted to destroy Defendant's cell phone so that evidence of the shooting could not be traced back to them. Defendant then admits that he disposed of at least one cell phone, supporting the conviction of obstruction of justice. Additionally, evidence presented at trial showed that Defendant attempted to obstruct the police investigation of the crimes by lying about his relationship with Ms. Wright and attempting to assign blame for the crime to someone who was in jail at the time of the shooting.

Accordingly, we find that the verdicts of guilty of second-degree murder, attempted second-degree murder, and obstruction of justice rendered in this case were not attributable to any error in admitting Ms. Catrice Johnson's testimony. Thus, Defendant's first assignment of error lacks merit.

**Assignment of Error Number Two – Excessive Sentences**

In his second assignment of error, Defendant asserts that the district court imposed unconstitutionally excessive sentences. Defendant avers that the district court erred in imposing consecutive sentences for his offenses, which, he alleges, formed a part of the same transaction or occurrence without articulating a particular justification for ordering the sentences to run consecutively, as required by La. C.Cr.P. Art. 894.1. Further, Defendant asserts that under the circumstances of this case, his sentences are unconstitutionally excessive because he was

sentenced to the statutory maximum time of imprisonment for attempted second-degree murder and obstruction of justice.

### A. Consecutive Sentences

Defendant first contends that, pursuant to La. C.Cr.P. art. 883, the district court erred in ordering Defendant's sentences to run consecutively because the offenses of which he was convicted were based on "the same act or transaction."

La. C.Cr.P. art. 883 states:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

Here, the record reflects the district court expressly directed that Defendant's sentences run consecutively, complying with the requirements of La. C.Cr.P. art. 883 in imposing concurrent sentences.

"Although sentences for crimes arising out of a single course of conduct are generally served concurrently, the imposition of consecutive sentences for such crimes is not automatically excessive." *State v. Collins*, 557 So.2d 269, 272 (La. App. 4 Cir. 1990). Consecutive sentences imposed by the trial court do not automatically constitute excessiveness. *State v. Watkins*, 1990-1603 (La.App. 4 Cir. 1993), 621 So.2d 157, 160. A court may impose consecutive sentences for same transaction crimes if the court expressly directs the imposition of consecutive sentences and articulates appropriate factors that justify the imposition of such sentences. *See State v. Jackson*, 552 So.2d 445, 448 (La. App. 4 Cir. 1989).

Here, the district court expressly imposed consecutive sentences. When the district court sentenced Defendant for the charge of attempted second degree

13

murder, it stated: "Therefore, the Court imposes the maximum sentence of 50 years at hard labor, consecutive to the life sentence imposed in Count One." Likewise, when the district court sentenced Defendant for the charge of obstruction of justice, the court stated: "

> In Count Three for the obstruction of justice, the maximum sentence of 40 years in the Department of Corrections. The $100,000 fine is suspended. Count Three is at hard labor. Count Three is consecutive to Count [T]wo, which is consecutive to [C]ount One.

We find that the district court did not abuse its discretion in imposing the sentences consecutively. The district court imposed sentences within the statutory guidelines for each of the offenses of which Defendant was convicted. The district court addressed the specific, unrefuted facts of the offenses themselves as they were presented at trial in finding that Defendant committed offenses that were "particularly heinous and atrocious," and in deciding that any lesser sentence the district court could impose would "depreciate the seriousness of th[ese] offense[s]."

The district court also noted that the conviction for obstruction of justice was for actions Defendant took after the first two offenses—thus constituting a different transaction justifying a consecutive sentence under La. Cr.C.P. art. 883. The district court also noted that Defendant "not only distanced [himself] from the event but then…tried to ascribe the blame for what happened to someone who was incarcerated on the day of the murder so (sic) could not have possibly committed the crime." The district court further noted that this action was an "intentional and devious act in the obstruction of justice…Not just failure to report a crime, it was an intentional act of, again, putting blame on someone else." Accordingly, we find that Defendant's sentences were not excessive because they were consecutive.

14

*B. Compliance with La. C.Cr.P. art. 894.1 – Sentencing Guidelines*

Because the district court ordered that Defendant's sentences run consecutively, the district court was required to consider the factors under La. C.Cr.P. art. 894.1 in imposing the consecutive sentences.

La. C.Cr.P. art. 894.1 states:

A. When a defendant has been convicted of a felony or misdemeanor, the court should impose a sentence of imprisonment if any of the following occurs:
(1) There is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime.
(2) The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution.
(3) A lesser sentence will deprecate the seriousness of the defendant's crime.
***
C. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence.

We find that the district court addressed adequately the requirements of La. C.Cr.P. art. 894.1 at Defendant's sentencing hearing. During the sentencing hearing, the district court stated:

The Court would note… this jury trial was held with the verdict being returned on September 12, 2018, that verdict being a unanimous jury, all 12 jurors concurring in each of the findings of guilty as charged on each of the three counts…

The Court has taken into account the sentencing guidelines as articulated in Article 894.1(C), both aggravating and mitigating factors that the Court must consider prior to imposition of sentence.

Count one, 14:30.1 relative to second degree murder. Of course the Court has no jurisdiction, imposes the sentence of life imprisonment without benefit of probation, parole, or suspension of sentence. That sentence is at hard labor and is a crime of violence.

On count two, attempted second degree murder of [Mr. Blanton], [t]he Court's sentencing range on this count is [ten] to [fifty] years, those sentences and those years being without benefit of probation, parole or suspension of sentence.

15

[T]he Court finds that this was a particularly heinous and atrocious crime…

The reviewing court is to consider the factors enumerated in La. C.Cr.P. art. 894.1 to guide its analysis and reason whether consecutive sentences imposed by the district court are excessive. The dangerousness and seriousness of the offense, the defendant's criminal history, his remorse and the risk to public safety are among the factors enumerated in La. C.Cr.P. art. 894.1. *Id.* (citing *State v. Jackson*, 552 So.2d 445 (La. App. 4 Cir. 1989). The district court specifically noted that it had taken the factors of La. C.Cr.P. art. 894.1 into account when it was considering the sentences, including both the aggravating and mitigating factors. The district court went on to note the specific facts of the case that were presented, including that Defendant:

> …[D]idn't just fire at the people, [Defendant] chased the victim down, stood over her, and tried to fire more shots. The gun jams; she some way, somehow manages to get to her feet and run for safety and security. And that jury heard that chilling 911 call where minutes must have seemed like hours. And she died.

The record establishes that, once the district court considered the factors under La. Cr.C.P. art. 894.1, the district court applied those factors to the facts surrounding the offenses of which Defendant was convicted, noting that Defendant pursued the victims in this case even after Ms. Johnson had collapsed from her wounds. Accordingly, we find that the district court comported with the requirements of La. C.Cr.P. art. 894.1 when it sentenced Defendant.

### C. Imposition of Maximum Sentences

We likewise find that the district court did not abuse its discretion when it imposed maximum sentences for the attempted second-degree murder of Mr. Blanton or obstruction of justice. Regarding the imposition of maximum sentences,

16

the district court held that "any lesser sentence than the one the Court is about to impose would deprecate the seriousness of this offense" for both of its sentences for attempted second-degree murder and obstruction of justice. At Defendant's sentencing hearing, the district court also stated:

> This Court finds in imposing the sentence that the videos in this case speak volumes about what happened that day... I have been on the bench for [twenty] years. I've been in this building for over [thirty]. I can tell you, as I know Ms. Johnson must and her family must live with every single minute of every single day, what was shown on that video was absolutely horrific and one of indelible, unforgettable sequence of events captured on film.
> …
>
> The victim's mother asks why and what for, and she may never know that. Whatever answer could be given that would ever equate to a logical reason for taking someone's life like that? A victim who had nothing to do with anything that was going on in your world that day but paid the ultimate price.
>
> Therefore, the Court imposes the maximum sentence of [fifty] years at hard labor, consecutive to the life sentence imposed in Count One.
>
> As to Count Three, the felony obstruction of justice charge, that being under [La. R.S.]14:130.1 B(1), where the obstruction of justice involves a crime that carries a life penalty. The Court finds that even subsequent to this murder that you were found guilty of, your efforts to derail an investigation, [obfuscate?], cloud up the New Orleans Police Department investigation into what happened on that day, where you not only distanced yourself from the event but then you tried to ascribe the blame for what happened to someone who was incarcerated on the day of the murder [who] could not have possibly committed the crime and then to Ms. Wright. The Court finds that that was an intentional and devious act in the obstruction of justice. Not just failure to report a crime, it was an intentional act of, again, putting the blame on someone else and trying to cloud this investigation. And therefore, again, the Court finds that any lesser sentence than the one it's about to impose would deprecate the seriousness of this offense.
>
> In Count Three for the obstruction of justice, the maximum sentence of [forty] years in the Department of Corrections. The $100,000 fine is suspended. Count Three is at hard labor. Count Three is consecutive to Count Two, which is consecutive to Count One.

Based on the record before us, we find that the maximum sentences imposed were not excessive under the circumstances of this case. In reviewing a sentence imposed by a trial court or excessiveness, "the only relevant question is 'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" *State v. Soraparu*, 1997-1027 (La. 10/13/97), 703 So.2d 608, 608. *See also State v. Batiste*, 2006-0875, p.17 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, 820.

First, we note that the consecutive sentences for attempted second-degree murder and obstruction of justice were imposed in addition to the mandatory term of life imprisonment for the conviction of second-degree murder. The district court had no discretion in imposing the life sentence. Therefore, under the circumstances, the sentences for the attempted second-degree murder and obstruction of justice convictions cannot be excessive.

Second, when the sentences for attempted second-degree murder and obstruction of justice were imposed, the district court noted that Defendant's crimes were "horrific" and articulated specific reasons for this finding, including noting that Defendant stalked the victims and attempted to continue to fire more shots at Ms. Johnson after she had already fallen to the ground from her gunshot wounds. The district court also found that Defendant's attempts to "derail" the NOPD investigation into this crime—which the district court specifically noted was a crime that carried a mandatory term of life imprisonment—constituted yet another aggravating factor that justified imposition of a maximum sentence. Therefore, the district court did not abuse its discretion by sentencing Defendant as it did.

## DECREE

For the forgoing reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED**